No. 24-3086
Decided via Published Opinion on July 25, 2025
Bloomekatz, Gilman, and Readler

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

### MONICA GRAY

Plaintiff-Appellant

v.

### STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; JOE KYLE

Defendants-Appellees

_____

On Appeal from the United States District Court
for the Southern District of Ohio
Hon. Algenon L. Marbley
Case No. 2:20-cv-06038

_____

## PETITION FOR REHEARING BY PANEL OR *EN BANC*

_____

J.D. Tripoli
(application for admission pending)
LITTLER MENDELSON, P.C.
833 East Michigan, Suite 900
Milwaukee, WI  53202
Telephone:   414.978.4604
Facsimile:   414.908.9293
E-mail:      jtripoli@littler.com

Jeffrey S. Hiller (OH #0081533),
   Trial Attorney
Andrew Klaben-Finegold (OH #0100484)
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:   614.463.4230
Facsimile:   614.573.7475
E-mail:      jhiller@littler.com
             aklaben@littler.com

*Attorneys for Defendants−Appellees*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **MONICA GRAY,** | : | |
| | : | |
| Plaintiff-Appellant, | : | |
| | : | |
| v. | : | Case No. 24-3086 |
| | : | |
| **STATE FARM MUTUAL** | : | |
| **AUTOMOBILE INSURANCE** | : | |
| **COMPANY AND JOE KYLE,** | : | |
| | : | |
| Defendants-Appellees. | : | |

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1, **State Farm Mutual Automobile Insurance Company** makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?

No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

i

Respectfully submitted,

**LITTLER MENDELSON, P.C.**

*/s/ Jeffrey S. Hiller*

Jeffrey S. Hiller (OH #0081533),
    Trial Attorney
Andrew J. Klaben-Finegold (OH #0100484)
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:   614.463.4230
Facsimile:   614.573.7475
E-mail:      jhiller@littler.com
             aklaben@littler.com

J.D. Tripoli
(application for admission pending)
833 East Michigan, Suite 900
Milwaukee, WI  53202
Telephone:   414.978.4604
Facsimile:   414.908.9293
E-mail:      jtripoli@littler.com

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**PAGE**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ................................................................................. i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................ v

I.  INTRODUCTION ..................................................................... 1

II.  THE PANEL MAJORITY'S CAUSATION ANALYSIS CREATES A NEW BRIGHT-LINE RULE THAT CONFLICTS WITH *STAUB*, *NASSAR*, AND THIS COURT'S PRECEDENT ............................. 3

    A.  *Staub* Sets Forth Requirements Of A Cat's Paw Claim ....................... 3

    B.  No Evidence Shows State Farm Relied On A Biased Supervisor's Facts Or Recommendations To Terminate Gray ............ 4

    C.  *Staub, Nassar,* And *Chattman* Compel The Conclusions In Judge Readler's Dissent ..................................................................... 7

III.  THE RECORD CONTAINS NO EVIDENCE OF COMPARATORS OR HEIGHTENED SCRUTINY TO WITHSTAND SUMMARY JUDGMENT ..................................................................... 11

    A.  Gray's Retaliation Claim Requires Proof Of A "Nearly Identical" Comparator Treated More Favorably That Is "Outside [Her] Protected Class" ..................................................................... 11

    B.  The Record Contains No Evidence Of Comparators Outside Gray's Protected Class Treated More Favorably, Which Is Fatal To Gray's Claims ..................................................................... 11

    C.  The Majority Opinion Conflicts With *Hamilton*'s Holding On Heightened Scrutiny Causation ..................................................... 14

IV.  THE MAJORITY BASED ITS CONCLUSIONS ON ARGUMENTS GRAY NEVER MADE, DISREGARDING THE PARTY PRESENTATION PRINCIPLE ..................................................... 15

# TABLE OF CONTENTS
### (Cont'd)

**PAGE**

V.    CONCLUSION.................................................................................17

CERTIFICATE OF COMPLIANCE.......................................................18

CERTIFICATE OF SERVICE ...............................................................19

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Chattman v. Toho Tenax Am., Inc.*,
  686 F.3d 339 (6th Cir. 2012) ...................................................................*passim*

*Goodsite v. Norfolk S. Ry. Co.*,
  573 F. App'x 572 (6th Cir. 2014) ..........................................................8

*Hamilton v. GE*,
  556 F.3d 429 (6th Cir. 2009) ...................................................3, 14, 15

*Henderson v. Chrysler Grp., LLC*,
  610 F. App'x 488 (6th Cir. 2015) ........................................................4, 8

*Madden v. Chattanooga City Wide Serv. Dep't*,
  549 F.3d 666 (6th Cir. 2008) ................................................................8

*Marshall v. Rawlings Co. LLC*,
  854 F.3d 368 (6th Cir. 2017) ...................................................................*passim*

*Noble v. Brinker Int'l, Inc.*,
  391 F.3d 715 (6th Cir. 2004) ...........................................2, 11, 13, 14

*Poland v. Chertoff*,
  494 F.3d 1174 (9th Cir. 2007) .............................................................7

*Romans v. Michigan Dept. of Human Servs.*,
  668 F.3d 826 (6th Cir. 2012) ...............................................................6

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020)...............................................................................15

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011)..................................................................................*passim*

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)..................................................................................*passim*

# TABLE OF AUTHORITIES
(CONT'D)

PAGE(S)

**STATUTES**

Americans With Disabilities Act of 1990,
  42 U.S.C. §§ 12101, *et seq*. ("ADA") ...............................................12

**OTHER AUTHORITIES**

6th Cir. R. 26.1 ...............................................................................i

6th Cir. R. 32 ...............................................................................18

Fed. R. App. P. 32 .........................................................................18

Fed. R. App. P. 40 .........................................................................18

## I.     __INTRODUCTION__

This petition concerns a new rule of proximate causation in employment retaliation cases. The new rule, issued by a divided panel of this Court, and which conflicts with Supreme Court and this Court's precedent, holds that proximate cause exists in a cat's paw case when a supervisor with knowledge of protected activity "reports true but selective information" of misconduct because "an investigation will always confirm the supervisor's allegation." Op. at 13. This rule applies even when (1) the employer conducts "an in-depth and truly independent investigation" that confirms the misconduct without reliance on the biased supervisor's facts or recommendations, breaking the causal chain, and (2) the independent "investigation reveal[s] additional misconduct not identified by [the biased supervisor]," making the decision "entirely justified" by a superseding cause. Op. at 13-14.

This decision warrants panel rehearing or *en banc* review on three independently sufficient grounds. First, the majority opinion improperly "expands the underlying legal doctrine on proximate cause" by "crafting a bright-line rule that 'report[ing] true but selective information' will 'always' be the proximate cause of any subsequent employment action—no matter what information a later investigation uncovers." Dissent at 37. This new rule is "based on arguments never made" by Monica Gray, amounting to a "departure from longstanding precedent." Dissent at 15, 34. Further, the opinion pushes the "proximate cause requirement"

1

towards a simple 'but-for' [causation] standard" that creates a retaliation claim "'any time a biased employee . . . sets in motion the process that leads to an adverse employment action.'" Dissent at 36. The majority's analysis conflicts with the Supreme Court's holding in *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) and this Court's holdings in *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012) and *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017) ("an independent investigation defeats a cat's paw claim [] when the investigation determines that the adverse action was . . . entirely justified"). The majority opinion also masks a prohibited "mixed-motive" analysis under the guise of "but-for causation" in conflict with *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 358 (2013), which prohibits "lessened causation standards" for retaliation claims which "would make it far more difficult to dismiss dubious claims at the summary judgment stage."

Second, the record contains no evidence of comparators "outside [Gray's] protected class," which is "fatal to her comparator argument," and thus to her claims. Dissent at 17, 33 (quoting *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728, 731 (6th Cir. 2004)). Her "heightened scrutiny" argument also fails because "distinctive management styles are not evidence" that allegedly biased supervisor Joe Kyle's "'scrutiny' ever 'intensified,'" or that "Gray's protected activity caused him to flag

her time entries." Dissent at 31-32 (quoting *Hamilton v. GE*, 556 F.3d 429, 435 (6th Cir. 2009)).

Third, the majority relies on arguments Appellant "never bothered to raise . . . [or] cite." Dissent at 15. This reliance on forfeited arguments conflicts with the party presentation principle recently reaffirmed by the Supreme Court and caused material errors in the majority opinion. Dissent at 18-19, 39-40.

## II.   THE PANEL MAJORITY'S CAUSATION ANALYSIS CREATES A NEW BRIGHT-LINE RULE THAT CONFLICTS WITH *STAUB*, *NASSAR*, AND THIS COURT'S PRECEDENT.

### A.   *Staub* Sets Forth Requirements Of A Cat's Paw Claim.

"Gray relies on indirect evidence of retaliation." Op. at 4. The majority "quickly dispose[d]" of Gray's "direct liability claim" for State Farm's decision to terminate her for eleven incidents of timecard falsification in one month. Op. at 9. To establish vicarious liability in a cat's paw case, the Supreme Court requires a plaintiff to show (1) a supervisor (2) performed an act motivated by retaliatory animus that was (3) intended to cause an adverse employment action and (4) the *proximate cause* of the ultimate employment action. Dissent at 19 (quoting *Staub*, 562 U.S. at 422). "[O]nly if Gray (1) presents a prima facie case of retaliation and (2) shows that Kyle's offered reasons are pretextual may she move on separately to trying to prove the cat's-paw-specific requirements of proximate cause, intent, and supervisor status." Dissent at 29.

**B.** **No Evidence Shows State Farm Relied On A Biased Supervisor's Facts Or Recommendations To Terminate Gray.**

"[I]n *any* case of cat's-paw liability" it is "necessary" for the plaintiff to show "the independent investigation *relies on facts provided by* the biased supervisor." *Staub*, 562 U.S. at 421 (emphases added). Likewise, this Court requires evidence the decisionmaker "*rel[ied] on facts provided by*" the biased reporter and "the independent investigation by the employer 'takes [the biased report] into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" *Chattman*, 686 F.3d at 352 (quoting *Staub*, 562 U.S. at 420) (emphases added). The cat's paw theory exists so employers cannot "*unthinkingly adopt the recommendations* of their biased lower-level supervisors" or "evade liability through *willful blindness* as to the source of reports and recommendations." *Marshall*, 854 F.3d at 378 (emphases added).[1]

Here, the majority did not cite *any* fact or recommendation State Farm relied on that Kyle supplied—it just concluded Kyle "selectively" did not report Diane Parker while he was covering for Gray's and Parker's regular supervisor Chris Martin, who was on vacation. Op. at 12-14.[2] Undisputed evidence shows that Geri

---

[1] "[W]hen considering retaliation claims, . . . 'the availability of cat's paw theory to impute knowledge of a protected activity to the decisionmaker is less than clear under this court's precedent.'" *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 496 (6th Cir. 2015) (internal citations omitted).

[2] As Section III shows, this finding ignores that: Parker added a break because she forgot to clock out, she did not manually reduce computer-recorded breaks like

Keeling, the HR investigator charged with investigating Gray's fraudulent timecard entries, did not rely on *any* fact or recommendation from Kyle, much less engage in willful blindness or unthinkingly adopt Kyle's report. Indeed, Kyle made no "recommendation" at all to discipline Gray. *See* R.30-20, PageID#1877-88, ¶¶4-5, 7.[3] Keeling indisputably removed Kyle from the investigation on December 4, 2017, then decided on her own the scope of her independent investigation, including other team members' records she would review. R.30-5, PageID#958-61, ¶¶4-9; *see* R.30, PageID#253-61.

Crucially, Kyle was not the gatekeeper or source of the records Keeling relied upon. Keeling had access to the same records as Kyle and, importantly, many more. Instead, Keeling gathered the timekeeping and computer activity records *she* wanted to review from independent sources at State Farm—not what Kyle had supplied. *Id*. She confirmed three discrepancies Kyle had found in November 2017, plus *eight more* discrepancies that Kyle did not find. *Id*. Using records to which Kyle did not have access, Keeling investigated whether Gray was even in the building when she

Gray; Parker was *seen* in the building consistent with her timesheets, unlike Gray; and no record evidence shows Parker did not engage in protected activity and, thus, was outside Gray's protected class.

[3] Rather, it was Martin who recommended termination. R.30-9, PageID#1199, ¶30. Kyle merely reported to HR—at his manager's direction—several entries State Farm's timekeeping software flagged because Gray manually reduced prior clock-posted breaks, which appeared to conflict with Gray's computer activity logs and visual absence from the office.

claimed to be at her desk working, relying on computer log on/off and building entry badge records. Kyle could only visually confirm whether he saw employees in the building at reported times (like Parker) or did not see them (like Gray). But Keeling obtained objective evidence proving Gray was not in the building, which is a superseding cause for termination. *Id*.

Keeling also interviewed Gray without Kyle. Gray could not explain a single discrepancy, became combative and flippant, and was dishonest in the interview. *Id*. Further, Gray was dishonest the next day when she pitched to Martin a false excuse that the timeclocks were broken. Keeling reviewed and explained away Gray's false excuse. Gray's dishonesty bolstered Martin's decision to recommend termination. R.30-9, PageID#1193-94, ¶17; *id*. at PageID#1233; R.30-10, PageID#1258. The majority ignored these superseding causes for Gray's termination.

State Farm's reliance on Keeling's investigation is far from the requisite "willful blindness" or "unthinking[] adopti[on]" that rubber-stamps a biased supervisor's "recommendation" to terminate employment. R.43-1, PageID#3706, ¶9. Instead, it reflects the type of "independent fact gathering" this Court holds "defeat[s] a cat's paw claim" because the investigator conducted "an independent evaluation of the situation" showing the adverse action was "entirely justified," breaking the causal chain. *Marshall*, 854 F.3d at 380; *see, e.g.*, *Romans v. Michigan Dept. of Human Servs.*, 668 F.3d 826, 836-37 (6th Cir. 2012) (rejecting cat's paw

because independent investigation confirmed allegedly biased report of violation and discovered additional violations "entirely justif[ying]" termination).

### C. *Staub*, *Nassar*, And *Chattman* Compel The Conclusions In Judge Readler's Dissent.

To support proximate cause, the majority held that "when a supervisor reports true but selective information, an investigation will *always* confirm the supervisor's allegation," and this would "foreclose liability . . . for selective reports." Op. at 13 (quoting *Staub*, 562 U.S. at 420) (emphasis added). But *Staub* mandates a different conclusion. *Staub* "hold[s] that if a supervisor performs an act motivated by [retaliatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub*, 562 U.S. at 422. Here, the majority "push[es] *Staub*'s proximate cause requirement towards a . . . standard, under which an employer is liable 'any time a biased employee . . . sets in motion the process that leads to an adverse employment action.'" Dissent at 36 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007)). This is not, and cannot be, the law.

Proximate cause requires "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Staub*, 562 U.S. at 419. "Kyle, it is true, 'set[] in motion' the events that led to Gray's firing." Dissent at 36. But the record contains no evidence of a "direct relation" between his actions and Gray's termination. *Id.* To fill that case-dispositive gap, the majority opinion "expands the underlying legal

7

doctrine on proximate cause" and "craft[s] a bright-line rule that 'report[ing] true but selective information' will 'always' be the proximate cause of any subsequent employment action—no matter what information a later investigation uncovers." Dissent at 37. But again, "[t]his case is a poor vehicle for doing so" because Kyle's report "was not selective" and Gray lacks proper comparators. *Id.* (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008)).

If a "true but selective" report always permits the Court to disregard a subsequent investigation that independently uncovers terminable misconduct apart from the biased supervisor's recommendation, then the new rule contradicts *Staub*'s exception to cat's paw liability when the termination is "entirely justified." *Staub*, 562 U.S. at 421; *see also Chattman*, 686 F.3d at 352; *Marshall*, 854 F.3d at 380 ("[A] biased recommendation is [*not*] *always* sufficient to sustain a cat's paw theory" because "an independent investigation defeats a cat's paw claim [] when the investigation determines that the adverse action was . . . entirely justified") (emphasis added). Further, the new rule conflicts with this Court's decisions holding that causation did not exist because the reported facts were largely undisputed or had independent ample support in the record (as here). *See, e.g.*, *Henderson*, 610 F. App'x at 496 (holding employer was not liable for retaliation under cat's paw theory because allegedly biased manager's negative review "has ample support in the record from her supervisors and her customers"); *Goodsite v. Norfolk S. Ry. Co.*,

573 F. App'x 572, 587 (6th Cir. 2014) (rejecting cat's paw if facts supporting termination were largely undisputed or admitted).

Worse, the new rule disincentivizes employers from conducting careful independent investigations and creates liability where none should exist. The Supreme Court has warned against using a "lessened causation standard" because, for example, "an employee who knows that he or she is about to be fired . . . might be tempted to" engage in protected activity and use that to show causation. *Nassar*, 570 U.S. at 358. Similarly, the new causation analysis creates retaliation liability where an employee is selectively reported for a policy violation but terminated because the employer independently discovered the employee was, for example, a wanted fugitive. Before the majority's opinion, if an independent investigation revealed such evidence, termination would be "entirely justified" by this superseding cause. *Chattman*, 686 F.3d at 352. Under the majority's new rule, the employee is immunized by the lessened "set in motion" causation standard. Such rules defy common sense, lead to absurd results, and conflict with precedent.

The majority justified disregarding State Farm's independent discovery of "additional misconduct not identified by Kyle, . . . that . . . alone justified Gray's termination" by reasoning that "Kyle's report was *a* but-for cause of her discharge" because State Farm "investigated Gray only after Kyle reported her" so her termination "resulted from Kyle's alleged 'antecedent' retaliation" of selective

reporting. Op. at 14 (emphasis added). But this reasoning masks a mixed-motive analysis that cannot support a retaliation claim. "[R]etaliation claims require proof that the desire to retaliate was *the* but-for cause of the challenged employment action." *Nassar*, 570 U.S. at 352 (emphasis added).[4] If a biased reason (Kyle's purportedly selective report) and an unbiased independent reason (State Farm's discovery of additional violations based on records Kyle did not even have, justifying termination) were the motivating factors supporting causation, this is prohibited for retaliation claims. *Id.*

In contrast, "the selective reports that served as 'conduit[s]' for supervisor bias in past cases, . . . are different in kind from Kyle's" because "the selective report provided the *entire basis* for the ultimate employment action." Dissent at 37 (emphasis added). Because of that total reliance on the biased supervisor's selective reports, and the absence of a retaliation claim, there was no mixed-motive problem in those cases, unlike here.[5]

---

[4] *Staub* was based on a claim that permitted "motivating factor" causation. 562 U.S. at 421. The majority ignored this distinction despite quoting mixed-motive causation when employers delegate "part of" a decision. Op. at 14 (quoting *Staub*, 562 U.S. at 425 (Alito, J. concurring in the judgment)). *Nassar* rejected such causation for retaliation claims like Gray's. 570 U.S. at 360.

[5] The "selective report" reasoning also ignores that Kyle honestly believed Gray violated policy and that Parker and others did not. "Kyle's honest belief that Gray misreported her lunchbreaks is above reproof." Dissent at 32. *See Marshall*, 854 F.3d at 386 (Sutton, J., dissenting) (supporting rejection of cat's paw theory where

III.    **THE RECORD CONTAINS NO EVIDENCE OF COMPARATORS OR HEIGHTENED SCRUTINY TO WITHSTAND SUMMARY JUDGMENT.**

A.    **Gray's Retaliation Claim Requires Proof Of A "Nearly Identical" Comparator Treated More Favorably That Is "Outside [Her] Protected Class."**

To establish causation for her *prima facie* case, Gray must "show[] that [s]he was either replaced by someone outside the protected class or treated differently than similarly situated, non protected employees." *Noble*, 391 F.3d at 728 (emphasis added). Gray also may establish pretext by showing the asserted reason was insufficient to warrant the action based on comparator treatment. Dissent at 17. "[T]o be considered 'similarly situated' in the disciplinary context, '[Gray] must show that the "comparables" are similarly-situated' in all respects." *Noble*, 391 F.3d at 728-29 (emphasis added) (citation omitted). The comparator must be "nearly identical," subject to "the same supervisor" and "standards," and engaged in "the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id*.

B.    **The Record Contains No Evidence Of Comparators Outside Gray's Protected Class Treated More Favorably, Which Is Fatal To Gray's Claims.**

The majority and dissent agree that State Farm fired Gray for falsifying timecards. Op. at 4, 15-16. State Farm first learned of reason to be suspicious of

---

allegedly biased supervisors were not motivated by discriminatory animus and honestly believed the nondiscriminatory reasons for the adverse actions).

Gray's entries from Kyle, who reported her to HR at his manager's direction. More than three months before Kyle's report, Kyle allegedly was told that Gray had helped disabled coworker Sonya Mauter oppose State Farm's decision to suspend her ADA accommodation (the alleged protected activity).[6]

The majority concluded that "Kyle reported Gray for conduct that was 'virtually identical' to" one comparator, Parker. Op. at 12. According to the majority, both "manually *changed* their lunch breaks so that they were at [Gray] or just under [Parker] the 50-minute limit." Op. at 10 (emphasis added). But "Kyle did not treat Parker and Gray in the same way." *Id*. He reported Gray to HR and "coached" Parker for being unproductive.

The actual record tells a much different story. Parker made no "change" to *reduce* a prior computer-recorded break. She manually *added* a break after she forgot to clock-in. More importantly, Parker was *visually confirmed* to be in the building with colleagues during her reported breaks, unlike Gray (whose presence could not be visually confirmed because she was outside the building when she claimed to have been working). R.43-2, PageID#3712-13, ¶15.

---

[6] Kyle did not "den[y] . . . Mauter's accommodation" as the majority erroneously stated, Op. at 6. He merely told Mauter of State Farm's decision, which he did not make, and which impacted everyone with reduced hours accommodations. R.30-21, PageID#1902-03; R.43-1, PageID#3706, ¶4. Mauter remains employed by State Farm.

Most importantly, Gray never produced any evidence that Parker fell "outside [her] protected class," as required. *Noble*, 391 F.3d at 728. Gray failed to produce evidence that Parker did not engage in ADA-protected activity, which is "fatal to her comparator argument." Dissent at 17, 33 (citing *Noble*, 391 F. 3d at 728, 731).

Kyle followed State Farm's regular practice (and his manager's instruction) by reviewing timecards, reporting Gray to HR, and coaching Parker for unproductive time when he saw her in the building. *See* Doc.27, Pages:22-24. Undisputed testimony showed Parker *and Gray* were treated the same (coached) for "talking with others in the halls and standing at others' cubicles" while clocked in (which could be work or unproductive) when a supervisor "know[s] that they're there," which was markedly different than Gray claiming to be in the building when she was not. R.30-12, PageID#1340-41, 1391-92, 1402-03; R.43-2, PageID#3712-13, ¶15. The department and Company consistently treated the former as a performance issue, meriting coaching, and the latter as an integrity issue, meriting discipline. Doc.27, Page:58. Nothing in the record rebuts this evidence.

Lastly, the majority found that Gray "identified specific colleagues who also rounded their time entries but were not reported." Op. at 14. But Gray did not report this alleged rounding to Kyle. Instead, Gray claimed she told *Martin* in December that three employees working from home had rounded but offered no evidence she supplied dates of such rounding. R.42-1, PageID#3216, ¶30. Notably, Gray's

13

January 1, 2018, letter to Martin did not name the three employees who rounded and once again omitted the dates of any alleged rounding. R.30-2, PageID#668. No evidence shows that *Kyle* was aware of these three employees rounding—which "rounded" entries *are not flagged* by the timekeeping software (like manual changes are)—or that they had a pattern of manually reduced breaks of 50 minutes to avoid attendance discipline like Gray. In any event, Gray admitted she was not terminated for rounding. R.30-2, PageID#366-67, 385-88. The record therefore contains no evidence of employees *outside the protected class* who were similarly situated but treated more favorably without differentiating circumstances, undermining Gray's *prima facie* case and pretext arguments. Dissent at 17, 33 (citing *Noble*, 391 F.3d at 728, 731).

### C.   The Majority Opinion Conflicts With *Hamilton*'s Holding On Heightened Scrutiny Causation.

The majority held that Kyle's late November 2017 timekeeping software flag review was "heightened scrutiny" of "previously ignored conduct" and inferred causation for Gray's *prima facie* case (Op. at 7-8 (citing *Hamilton*, 556 F.3d at 435)) and pretext (Op. at 12) because it occurred after Gray's mid-August 2017 protected activity. But who "ignored" Gray's misconduct before her protected activity? Not Kyle. He was never her regular supervisor. Instead, the majority compared Kyle's consistent strict management style verifying timesheets, with that of Martin who did not know how to use computer activity reports to verify whether someone was

14

working when timekeeping software flagged the entry. "A lazy manager (Martin) did not care about checking timesheets. He was replaced by a strict one (Kyle) who did. What inference does this allow? Only that Kyle took this managerial duty more seriously than Martin did." Dissent at 31. But "distinctive management styles are not evidence that Kyle's 'scrutiny' ever 'intensified,' . . . or, it follows, that Gray's protected activity caused him to flag her time entries." Dissent at 32 (quoting *Hamilton*, 556 F.3d at 432). "Without evidence that Kyle's efforts marked 'intensified' analysis, Gray cannot succeed on this theory of causation" to establish her *prima facie* case or pretext. Dissent at 31 (quoting *Hamilton*, 556 F.3d at 432).

## IV.   THE MAJORITY BASED ITS CONCLUSIONS ON ARGUMENTS GRAY NEVER MADE, DISREGARDING THE PARTY PRESEN-TATION PRINCIPLE.

The majority's opinion violates the party presentation principle articulated in *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). For example, the majority found causation based on Kyle's "heightened scrutiny . . . after Gray engaged in protected activity." Op. at 12. As the dissent aptly observes, "Gray made this argument only in her reply brief." Dissent at 30. Gray "never cites any of the majority opinion's case law on this point (save for one case, in an unrelated context), and never develops any argument under this theory." *Id*. Similarly, Gray's *prima facie* and pretext arguments focused on "State Farm['s]" adverse action of "terminat[ion]," not Kyle's report. *Id*. at 21-22. "Embracing positions Gray never

15

advanced plainly prejudices State Farm, who was not on notice that it needed to address those points with the Court." *Id*. at 15.

In response to the dissent's critique, the majority cited where Gray had sparingly referenced "cat's paw," but acknowledged her brief was "inartfully drafted" and never mentioned "vicarious liability" despite being drafted by counsel. Op. at 5 n.2. In excusing Gray's forfeiture, the majority cited nowhere Gray mentioned "heightened scrutiny" before her reply. Until then, Gray had only mentioned cat's paw when arguing that: (1) State Farm could not use an honest belief defense because it had not "confirmed that Gray's time cards were . . . intentionally falsified," R.22 at 60; and (2) "[t]he District Court failed to analyze whether State Farm conducted a truly independent investigation" by insufficiently investigating Gray's excuses,[7] *id*. at 62.

This case warrants panel rehearing or *en banc* review to address arguments Gray "never bothered to raise, with reference to evidence she never bothered to cite." Dissent at 15. Granting this petition would resolve the factual discrepancies and conflicts addressed in this brief and provide State Farm "a fair chance to respond to the Kyle-centric case the majority opinion now embraces." Dissent at 25.

---

[7] By then, State Farm had confirmed the "accuracy of th[e] information" and "found separate evidence" so it did not need to "disprove Gray's allegation." Dissent at 38.

16

## V.    <u>CONCLUSION</u>

Defendants-Appellees respectfully request that their Petition for Rehearing by Panel or *En Banc* be granted to resolve important questions and address how the majority's decision conflicts with controlling precedent.

Respectfully submitted,

**LITTLER MENDELSON, P.C.**

*/s/ Jeffrey S. Hiller*

Jeffrey S. Hiller (OH #0081533),
   Trial Attorney
Andrew J. Klaben-Finegold (OH #0100484)
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:   614.463.4230
Facsimile:   614.573.7475
E-mail:        jhiller@littler.com
             aklaben@littler.com

J.D. Tripoli
(application for admission pending)
833 East Michigan, Suite 900
Milwaukee, WI  53202
Telephone:   414.978.4604
Facsimile:   414.908.9293
E-mail:        jtripoli@littler.com

*Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document contains 3,898 words of proportionally spaced, 14-point type using Microsoft Word 365, and complies with applicable content, word count and formatting requirements, including in Fed. R. App. P. 32 and 40 and 6th Cir. R. 32.

*/s/ Jeffrey S. Hiller*
Trial Attorney for Defendants-Appellees

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 15th day of August, 2025, the foregoing *Defendants-Appellees' Petition for Rehearing by Panel or En Banc* was filed via the Court's electronic filing system. Notice of filing will be performed by the Court's electronic filing system, and Parties may access the document through the Court's electronic filing system.

/s/ Jeffrey S. Hiller
Trial Attorney for Defendants-Appellees

4936-4936-7129 / 021168.1252

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0195p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

MONICA GRAY,

*Plaintiff-Appellant,*

*v.*

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; JOE KYLE,

*Defendants-Appellees.*

┐
│
│
│  No. 24-3086
│
│
┘

———————————

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-06038—Algenon L. Marbley, District Judge.

Argued: December 11, 2024

Decided and Filed: July 25, 2025

Before: GILMAN, READLER, and BLOOMEKATZ, Circuit Judges.

———————————

### COUNSEL

**ARGUED:** Laren E. Knoll, THE KNOLL LAW FIRM LLC, Dublin, Ohio, for Appellant. Jeffrey S. Hiller, LITTLER MENDELSON, P.C., Columbus, Ohio, for Appellees. **ON BRIEF:** Laren E. Knoll, THE KNOLL LAW FIRM LLC, Dublin, Ohio, Daniel I. Bryant, BRYANT LEGAL, LLC, Columbus, Ohio, for Appellant. Jeffrey S. Hiller, Andrew Klaben-Finegold, LITTLER MENDELSON, P.C., Columbus, Ohio, for Appellees. Georgina C. Yeomans, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

BLOOMEKATZ, J., delivered the opinion of the court in which GILMAN, J., concurred. READLER, J. (pp. 15–40), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

BLOOMEKATZ, Circuit Judge.    Monica Gray helped a colleague secure an accommodation under the Americans with Disabilities Act (ADA).  The colleague's supervisor opposed the accommodation and, a few months later, reported Gray for timecard falsification. State Farm investigated the report and fired Gray.  Gray then sued for retaliation under the ADA and Ohio law, claiming that the supervisor singled her out for conduct widespread in the agency because she had helped her colleague advocate for an accommodation.  But the district court granted State Farm summary judgment, reasoning that the company had an honest belief that Gray had engaged in misconduct.  Because Gray can proceed on a theory of vicarious liability based on the supervisor's alleged bias, we reverse.

## BACKGROUND[1]

Monica Gray worked at State Farm for fifteen years until she was fired.  At the time of her termination, Gray was a claim specialist on a team managed by Chris Martin.  Her friend, Sonya Mauter, had also been with State Farm for many years.  But she worked on a different team managed by Joe Kyle.

Mauter had an ADA accommodation that exempted her from overtime work.  In August 2017, Kyle told Mauter that State Farm would no longer accommodate her work schedule.  He placed Mauter on leave until she agreed to work overtime.  And if she did not agree to overtime, Kyle threatened, she could eventually be terminated.  When Mauter asked to use her leave under the Family and Medical Leave Act, Kyle said she had none left.  Mauter later discovered that was not true.

Mauter turned to Gray for help.  Gray researched ADA law and State Farm policies, contacted human resources for information, and even lodged an internal complaint against Kyle. Gray coached Mauter on how to advocate for herself.  She also advised Mauter to seek legal

———————————————

[1]At this stage, we construe the evidence in the light most favorable to Gray, the nonmoving party.  *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559 (6th Cir. 2022).

counsel and file an EEOC discrimination charge, which Mauter did. Throughout this process, Mauter repeatedly informed Kyle that Gray was assisting her.

Meanwhile, Kyle intensified his scrutiny of Mauter. One time, he issued her a warning for discussing accommodations with colleagues, threatening her with "action up to and including termination." Warning, R. 30-21, PageID 2101. Mauter's lawyer sent State Farm a letter alleging that Kyle engaged in illegal retaliation. State Farm investigated Mauter's allegations and agreed to transition her to another team.

In November 2017, Kyle substituted for Martin—the supervisor of Gray's team—while Martin went on a short vacation. At the time, Martin took a relaxed approach to State Farm's timecard policies. State Farm's written policy required employees to adhere closely to scheduled shifts and allotted meal breaks. The policy also required employees to record time worked to the minute. But Martin was not a stickler for those rules. He did not monitor or verify his employees' timesheets, and at least some on his team rounded time rather than reporting it to the minute.

Notwithstanding Martin's relaxed practice, Kyle pored over Gray's timesheets in Martin's absence. He compared her time entries to her computer activity and noticed three instances when she reported time while logged off her computer. Kyle raised the issue with his and Martin's direct supervisor, Denise Hensley. And as required by company policy, Hensley told Kyle to report the discrepancies to HR. Policy, R. 30-2, PageID 631 (requiring all employees to "immediately" report timekeeping violations that they learn about). Kyle did so, telling HR that Gray had manually adjusted her time to hide long lunches and early departures. He incorrectly claimed that Gray had previously been coached for such behavior. And he suggested that HR would find more discrepancies if it investigated Gray's records.

When Martin returned from vacation, Kyle met with him, Hensley, and Geri Keeling from HR. Kyle shared the evidence that he had gathered on Gray, prompting Keeling to launch an investigation. Keeling reviewed Gray's timesheets, computer activity, and building-entry records. She found more errors, including seven instances when Gray reported returning from lunch before she had re-entered the building.

Keeling and Martin interviewed Gray about these discrepancies. This was the first time Gray learned that she was being investigated. Gray denied any wrongdoing and insisted that Kyle had targeted her for helping Mauter secure an accommodation. She also claimed that the timing was suspicious, and she asked if State Farm was reviewing other employees' timesheets. Keeling relayed Gray's allegation of retaliation to Hensley, but no one at State Farm pursued the issue further.

A week later, Martin and Hensley recommended Gray's termination to upper management. Gray did not know about the pending recommendation. In the meantime, she filed a retaliation charge with the EEOC. A few days later, State Farm fired her for falsifying her timesheets.

Gray sued Kyle and State Farm for retaliation under the ADA and its Ohio counterpart. *See* 42 U.S.C. § 12203; Ohio Rev. Code § 4112.02. She alleged that Kyle selectively reported her for otherwise common behavior, prompting State Farm to investigate and ultimately fire her. After discovery, the district court granted State Farm's motion for summary judgment. The court reasoned that State Farm held an "honest belief" that Gray falsified her time and fired her for that reason. Op., R. 52, PageID 3743. It thus concluded that Gray could not show pretext, as required for her retaliation claims. Gray timely appealed.

### ANALYSIS

We review the district court's grant of summary judgment de novo. *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559 (6th Cir. 2022). We affirm if, viewing the evidence and drawing all reasonable inferences in Gray's favor, Gray has failed to create a genuine dispute of material fact. *See id.* We reverse if Gray has presented evidence from which a jury could reasonably find in her favor. *See id.* Contrary to the district court's opinion, Gray claims that she had such evidence for her retaliation claims.

We analyze retaliation claims under the ADA and Ohio law identically. *Id.* at 560. Because Gray relies on indirect evidence of retaliation, we apply the *McDonnell Douglas* burden-shifting framework. *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 661 (6th Cir. 2020). Under that framework, Gray must establish a prima facie case of retaliation. *Id.* If she meets

that threshold, then State Farm must articulate a legitimate, nonretaliatory reason for its adverse action.  *Id.*  If State Farm provides such a reason, then Gray must show that the reason is a pretext designed to mask retaliation.  *Id.*  At summary judgment, we examine whether a genuine factual dispute exists at each of these steps.  *Id.*

In this case, Gray invokes both direct and vicarious theories of liability.  And that fact affects our analysis to some extent.  In the discrimination context, an employer is directly liable for the unlawful motives of its decisionmakers—that is, those who made the challenged employment decision.  *See Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 210 (6th Cir. 2021).  So for direct liability claims, we focus our *McDonnell Douglas* analysis on the relevant decisionmakers.

Vicarious liability, commonly known as "cat's paw" liability, hinges on a neutral decisionmaker acting on a biased subordinate's input.  *See Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017).  The theory thus shifts the motive analysis from the decisionmaker to the subordinate.  *See Sloat*, 18 F.4th at 210–13.  And since Kyle is the allegedly biased subordinate here, we use the *McDonnell Douglas* framework to assess his motives.  *Id.*  In this case, we consider Gray's direct and vicarious allegations together, evaluating her evidence for both theories at each step of our analysis.[2]

---

[2]The dissent's main argument—that Gray has forfeited a cat's paw claim—is puzzling.  So too is its contention that we blindside State Farm by addressing the claim.  After all, it was State Farm that first raised cat's paw liability in its motion for summary judgment.  *See* MSJ, R. 30, PageID 267 (discussing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)).  And Gray, for her part, has since raised it again and again.  She has explicitly relied on a cat's paw theory in her briefings before the district court and on appeal.  *See* MSJ Opp'n, R. 42, PageID 3139, 3204 ("Gray relies on the cat's paw theory of liability.");  Appellant Br. at 18, 50 (same).  She has focused on Kyle's actions and motives throughout her briefs.  *See, e.g.*, MSJ Opp'n, R. 42, PageID 3133 ("Based on Defendant Kyle's skewed version of events . . . , State Farm terminated Gray.");  Appellant Br. at 3–4 ("Time theft . . . is merely pretext as for Kyle's retaliatory animus.").  And many of her arguments regarding her prima facie case and pretext would seem irrelevant outside of a cat's paw context, especially given that she concedes that Kyle was not a decisionmaker.  *See* Appellant Br. at 28–30 (discussing Kyle's knowledge of Gray's protected activity); *id.* at 42–45 (discussing temporal proximity between Kyle's report and Gray's protected activity).  Although some of Gray's briefings lacked a heading with the words "cat's paw" or "vicarious liability," raising an argument does not require "the incantation of particular words."  *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000).  Nor do we "flunk a party simply because" their brief may have been "inartfully" drafted.  *Coffey v. Carroll*, 933 F.3d 577, 586 (6th Cir. 2019).

## I.      Prima Facie Case

To establish her prima facie case, Gray must present evidence that (1) she engaged in protected activity, (2) State Farm knew about her activity, (3) she suffered an adverse action, and (4) the adverse action was causally connected to her protected activity.  *Kirilenko-Ison*, 974 F.3d at 661.  For the third element, Gray relies on her termination, which unquestionably qualifies as an adverse action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–64, 68 (2006).  We therefore focus on the other elements.

### 1.      Gray's Protected Activity and State Farm's Knowledge

We start by addressing the first two elements: Gray's protected activity and State Farm's knowledge of it.  Gray says that she engaged in protected activity by helping Mauter "reinstate and secure" her ADA accommodation despite Kyle's opposition.  Mauter Decl., R. 42-2, PageID 3223.  We agree.  The ADA's anti-retaliation provision protects employees who aid others' exercise of their statutory rights.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *see also White*, 548 U.S. at 63.  Gray supported Mauter throughout the ADA process, actively pushing back against Kyle's denial of Mauter's accommodation.  Those efforts qualify as protected activity.[3]

Gray also presents evidence that Kyle and others knew about her involvement.  Mauter recalls informing Kyle and Hensley of Gray's assistance.  And Gray says that she told Keeling and Martin that Kyle had targeted her for helping Mauter.  Gray thus has evidence that Kyle and at least two of the relevant decisionmakers (Hensley and Martin) knew about her protected activity.  State Farm disagrees, but its argument relies on credibility determinations that belong to the jury.  *See Kirilenko-Ison*, 974 F.3d at 660.  We therefore hold that Gray has raised genuine disputes over the protected activity and knowledge elements of her prima facie case.

---

[3]Gray alleges other instances of protected activity.  Because her efforts to help Mauter are sufficient, we do not address her other allegations.

### 2.    Causation

We next turn to the causation element of Gray's prima facie case.  At the prima facie stage, the burden of showing causation is "minimal."  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).  The plaintiff must merely "put forth some evidence to deduce a causal connection" between the adverse action and protected activity.  *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) (citation omitted).  Because retaliation takes many forms, our inquiry depends on the facts of each case.  *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007).  Gray alleges a single adverse action: her termination.  So her evidence must support "a causal connection" between her termination and her assistance to Mauter.  *A.C.*, 711 F.3d at 699.

We have held many times that employees can establish prima facie causation by showing that their employer began scrutinizing them more heavily shortly after they engaged in protected activity, and then used its findings to justify termination.  *E.g.*, *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009); *Upshaw*, 576 F.3d at 588–89; *Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473, 479 (6th Cir. 2017); *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1070–71 (6th Cir. 2015).  Gray relies on this theory, arguing that shortly after she helped Mauter, Kyle scrutinized her for timekeeping practices that no one had questioned before.  And she says that scrutiny provided fodder for a broader HR inquiry that ultimately led to her firing.

Gray's evidence aligns with our precedent.  To start, no one disputes that Gray faced more scrutiny after she helped Mauter advocate for an accommodation.  Martin supervised Gray for two years.  Until December 2017, he "admittedly" did not inspect his team's timesheets.  Appellees Br. at 10.  So before Gray helped Mauter, her time entries went unexamined, but afterward, they received close review and ultimately resulted in her discharge.

State Farm responds that this increased scrutiny resulted not from Gray's protected activity, but from a change in supervisors.  According to State Farm, Kyle, unlike Martin, always verified manual time entries and simply followed that practice when he covered for Martin.  But as we explain below, Gray has evidence that Kyle did not scrutinize other employees on Martin's

team in the same way as her. So the differences between Kyle's and Martin's supervisory styles do not explain the particular scrutiny that Gray encountered.

Gray also has evidence that this heightened scrutiny occurred soon after her protected activity. State Farm investigated Gray only two or three months after she helped Mauter with her accommodation. So Gray not only experienced scrutiny for previously ignored conduct, but she did so shortly after she engaged in protected activity. That evidence is enough to raise a triable question on her direct liability claim. *See Upshaw*, 576 F.3d at 588–89.

When it comes to Gray's cat's paw claim, the temporal proximity is even closer. That is because when assessing temporal proximity, we consider whether the biased actor took the first opportunity that he had to retaliate. *See Kirilenko-Ison*, 974 F.3d at 665. Kyle's first opportunity to retaliate came in November 2017, when Martin went on vacation and Kyle filled in for him. Kyle then reviewed Gray's timesheets and immediately reported her to HR without consulting Martin. That timing by itself shows prima facie causation between Gray's protected activity and Kyle's actions. *Id.* at 665–66.

We have held similar evidence sufficient to show causation at this stage. *E.g.*, *Hamilton*, 556 F.3d at 432, 435–36; *Upshaw*, 576 F.3d at 588–89; *Adamov*, 681 F. App'x at 479. We therefore hold that Gray has established prima facie causation, and with that, her prima facie case of retaliation.

## II.    Pretext

We now consider State Farm's stated nonretaliatory reason and Gray's evidence of pretext. State Farm says that it terminated Gray for timecard falsification. That is a legitimate and nondiscriminatory reason, so we turn to Gray's evidence of pretext. *See Espitia v. Procter & Gamble Co.*, 93 F. App'x 707, 710 (6th Cir. 2004).

Our caselaw does not prescribe any particular method for showing pretext. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Usually, plaintiffs show pretext by arguing that the employer's proffered reason lacked a factual basis, did not actually motivate the adverse action, or was insufficient to motivate the adverse action. *Id.* But at

bottom, pretext is about causation: was the defendant's act motivated by the proffered reason or retaliation? *Sloat*, 18 F.4th at 210. And since Gray relies on both direct and vicarious theories of liability, that question applies to both Kyle's and the ultimate decisionmakers' motives.

We start with Gray's direct liability claim, and like the dissent, we quickly dispose of it. Recall that in investigating Gray's records, State Farm found several instances when her timesheets did not match her computer activity. When asked about those discrepancies, Gray said she could not recall and gave mostly vague answers. So even if Gray had not falsified her time, her records—and her failure to explain them—pointed in that direction. *See Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007). Gray responds that her records were no worse than those of other employees. And she emphasizes that State Farm never investigated anyone else, even after she identified potential comparators and alleged that Kyle had singled her out for retaliation. But Gray made that allegation when State Farm was already "contemplate[ing]" firing her. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Gray, moreover, does not have evidence of other employees who, like her, reported working when they were out of the building. In short, Gray has failed to call into question State Farm's stated reason for firing her. Her direct liability claim thus fails at this stage.

But Gray also seeks to hold State Farm vicariously liable for Kyle's actions. She argues that Kyle reported her for retaliatory reasons and that his report influenced State Farm's decision to fire her. State Farm counters that Kyle's decision to report Gray was based solely on her timekeeping violations, not on any retaliatory animus. According to State Farm, Kyle inspected timesheets as part of his "normal" managerial practice; reviewed Gray's timesheets in the same way he reviewed others'; and reported Gray for "well-founded" discrepancies in her records. Appellees Br. at 27, 50, 68. These explanations are legitimate and nonretaliatory, so we turn to Gray's evidence of pretext.

In arguing pretext, Gray insists that she never misreported her time. Gray does not dispute that her records showed certain discrepancies between her time and computer usage. She argues instead that her computer activity failed to capture tasks like answering phone calls or helping other employees. But this argument goes toward explaining the discrepancies; it does

not render the discrepancies factually baseless in the first place. Gray has therefore failed to raise a dispute over the factual basis of Kyle's report to HR about her timesheets.

But Gray's alleged timekeeping improprieties do not end our analysis. That is because Kyle could have used those improprieties as "a legal, legitimate reason" to "cover up his true, [retaliatory] motivations." *See Hamilton*, 556 F.3d at 436 (citation omitted). So we look at Gray's other evidence of pretext. On that front, Gray argues that even if she overstated her time, others did the same but were not reported or disciplined. We have upheld retaliation claims when the plaintiff "was singled out for adverse treatment." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 570 (6th Cir. 2019) (citation omitted); *see also Amos v. McNairy County*, 622 F. App'x 529, 540 (6th Cir. 2015). Gray claims that happened here. And we agree that she has enough evidence of differential scrutiny to raise a material dispute over Kyle's motives.

To start, consider the discrepancies for which Kyle reported Gray. On November 22, Gray manually ended her lunch at 3:10 p.m. but did not resume her computer activity until 3:16 p.m. On November 27, she manually ended her lunch at 3:13 p.m. but did not resume her computer activity until 3:30 p.m. And on November 29, Gray said she worked until 4:30 p.m., but her computer activity stopped at 4:21 p.m.

As Gray laid out in bullet points before the district court, Diane Parker, who was also on Martin's team, had nearly identical discrepancies in her records. *See* MSJ Opp'n, R. 42, PageID 3192–94. On November 22, Parker manually ended her lunch at 2:14 p.m. but did not resume her computer activity until around 2:30 p.m. On November 24, Parker manually ended her lunch at 4:00 p.m. but did not resume her computer activity until 4:15 p.m. And on November 29, Parker manually ended her lunch at 1:45 p.m. but resumed her computer activity at 2:00 p.m. Parker's 15-to-16-minute discrepancies tracked the 6-to-17-minute discrepancies that Kyle found in Gray's records. Both Gray and Parker manually changed their lunch breaks so that they were at or just under the 50-minute limit. And Kyle undisputedly knew about Parker's timecard discrepancies at the time he reported Gray.

Despite knowing about their similar conduct, Kyle did not treat Parker and Gray in the same way. He viewed Gray's actions as an "integrity" issue and reported her to HR. Yet he

considered Parker's conduct as a simple "performance" problem and informally "coached" her for her policy violations. Appellees Br. at 48–49. Gray therefore has evidence that Kyle scrutinized her more than Parker for virtually identical conduct. *See Hubbell*, 933 F.3d at 570. That is sufficient for her to withstand summary judgment. *See Strickland v. City of Detroit*, 995 F.3d 495, 514 (6th Cir. 2021).

State Farm's explanation does not justify this differential treatment, at least not beyond a genuine dispute. State Farm says Kyle reported Gray because, unlike Parker, Gray claimed to be working "when she was not even in the building." Appellees Br. at 49 (citation omitted). But Kyle did not report Gray for that reason. He reported her based on discrepancies between her time entries and computer activity. It is undisputed that Gray's alleged physical absences surfaced only after Kyle reported her. In fact, State Farm says Kyle lacked access to employees' building-entry records, so he could not have reported Gray based on those records. We cannot discern how Kyle could have distinguished between Gray and Parker based on information that he seemingly did not possess.

Apart from Parker, Gray also points to other employees who clocked into work but spent time socializing or visiting the cafeteria. State Farm concedes this happened, but frames it as a "performance" rather than a "falsification" issue. *Id.* at 46. But employees who claim to be working when they are not misreport their time. And State Farm's written policy treats both "inaccurately report[ing] time" and "[f]alsify[ing] a timesheet" as policy violations, without distinguishing between their severity. Policy, R. 30-2, PageID 630–31. To be sure, the jury could conclude that Gray engaged in more serious misconduct than these other employees. But because State Farm's policy does not draw that distinction, the question of whether Kyle singled Gray out for otherwise common behavior is a matter for the jury. *See Strickland*, 995 F.3d at 514.

State Farm identifies no other reason that could justify Kyle's unique scrutiny of Gray. Gray was the second highest performing member of her team in 2017. Kyle acknowledged that she was considered "a higher-level performer with more knowledge and technical skills than most." Kyle Dep., R. 30-21, PageID 2009. And Martin viewed her as "intelligent and capable of very high performance." Email, R. 30-5, PageID 969. Gray also served as "a lead resource

on policy, workflow, and process" for her colleagues.  Martin Dep., R. 30-12, PageID 1321.
This is therefore not a case in which performance issues precede and then prompt special
scrutiny.  *See, e.g.*, *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 450 (6th Cir. 2020); *Hall v. Ohio
Bell Tel. Co.*, 529 F. App'x 434, 440–41 (6th Cir. 2013).  Rather, heightened scrutiny seemed to
come only after Gray engaged in protected activity, with no other prevailing reason to justify it.

In sum, Gray has enough evidence to show that Kyle's stated reason for reporting her was
a pretext designed to mask retaliation.  We therefore hold that she has raised a genuine dispute
over Kyle's motives, as required for her cat's paw claim.

## III.    Causal Nexus

Even if Kyle harbored retaliatory animus toward Gray, he did not participate in the
decision to terminate her.  Gray therefore seeks to hold State Farm vicariously liable for Kyle's
retaliation, arguing that his motives can be imputed to the actual decisionmakers.  *See Sloat*,
18 F.4th at 210.  To succeed on that theory, Gray must show (1) that Kyle intended to cause an
adverse action against her for retaliatory reasons, and (2) that his actions proximately caused her
termination.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *E.E.O.C. v. Ford Motor Co.*,
782 F.3d 753, 768 (6th Cir. 2015) (en banc).  We have already determined that a factual dispute
exists over Kyle's motives for reporting Gray, so we need not analyze the intent prong.  *See
Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013).  We therefore
focus our analysis on proximate causation, as the parties do here.

Proximate causation requires "only some direct relation" between a biased supervisor's
action and the final adverse decision.  *Staub*, 562 U.S. at 419 (cleaned up).  Because injuries
often have "multiple proximate causes," a biased supervisor does not have to be the sole driver
behind the employer's decision.  *Id.* at 419–20.  The employer remains liable even if it relied
only partially on the supervisor's "biased report."  *Id.* at 419–21.  And it escapes liability only if
the supervisor's influence was "too remote, purely contingent, or indirect."  *Id.* at 419 (citation
omitted).

Gray has enough evidence to show that Kyle proximately caused her termination.  Kyle
reported Gray for conduct that was "virtually identical" to Parker's.  *Madden v. Chattanooga*

*City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008). He falsely claimed that Gray had been previously coached for taking long lunches. He also suggested that Gray likely misreported time on more than the three occasions that he discovered. A jury could conclude that Kyle caused State Farm to investigate Gray while anticipating other discrepancies that could lead to her termination. And it could conclude that State Farm relied on Kyle's "biased report" when it chose to investigate and ultimately terminate Gray. *Staub*, 562 U.S. at 421.

State Farm responds that Kyle's report was not biased because he honestly believed in the truth of his allegations. But a supervisor does not have to lie in order to be biased. As we have repeatedly recognized, a supervisor can cause an employee's termination by reporting true yet selective information. *Marshall*, 854 F.3d at 378; *Madden*, 549 F.3d at 677–78. A report is true yet selective if it singles out an employee for conduct that others also engage in. *See Madden*, 549 F.3d at 677–78; *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012). Gray therefore does not have to show that Kyle fabricated information to prevail.

State Farm next argues that even if Kyle made a biased report, State Farm can't be liable because it independently confirmed Kyle's allegations. We have held that an employer can escape liability by conducting "an in-depth and truly independent investigation" into an otherwise biased report. *Marshall*, 854 F.3d at 380. But when a supervisor reports true but selective information, an investigation will always confirm the supervisor's allegation. State Farm's argument would thus foreclose liability even for selective reports that are "*designed and intended* to produce the adverse action." *Staub*, 562 U.S. at 420. The Supreme Court has rejected such an "implausible" reading of antidiscrimination provisions. *Id.*

Our precedents likewise demonstrate that employers cannot avoid liability simply because they independently confirm the substance of a selective report. Consider *Madden*, where a supervisor reported an employee for setting off firecrackers while ignoring identical behavior by others. 549 F.3d at 678. The supervisor's report prompted an investigation by senior managers, during which the employee admitted to the supervisor's allegations. *Id.* at 670. The investigation thus left no question about the truth of the supervisor's report. But we nonetheless held the employer liable because "there was evidence that [the supervisor] discriminated in the information that he provided about employee misconduct to senior

managers." *Id.* at 678. We followed the same logic in *Chattman*, where an allegedly biased supervisor reported an employee for otherwise common behavior. 686 F.3d at 350, 353. There too, higher-ups independently confirmed the supervisor's report, directly interviewing witnesses rather than relying on the supervisor's account. *Id.* at 344. We still held that senior managers could serve "as the conduit of the supervisor's prejudice" if they investigated the employee based on the supervisor's selective report. *Id.* at 350–51 (cleaned up). Evidence of such a report, we concluded, created a genuine dispute over proximate causation. *Id.* at 352–53.

Gray presents similar evidence. She claims that Kyle selectively reported her to HR, and that his report led State Farm to investigate and terminate her. What's more, Gray alerted State Farm to potential retaliation, but State Farm failed to take her allegation seriously. Gray told Martin and Keeling that Kyle targeted her because she had helped Mauter with her accommodation. And she identified specific colleagues who also rounded their time entries but were not reported. Yet State Farm made no effort to determine whether Kyle had singled Gray out for retaliatory reasons. Even under a narrower view of vicarious liability, a jury could conclude that by ignoring Gray's allegation, State Farm effectively "delegated part of [its] decisionmaking power" to Kyle. *Staub*, 562 U.S. at 425 (Alito, J., concurring in the judgment).

Finally, State Farm contends that even if Gray can show proximate causation, she cannot demonstrate that Kyle's report was a but-for cause of her discharge, as required by the ADA. *See Ford Motor Co.*, 782 F.3d at 767. State Farm reasons that its investigation revealed additional misconduct not identified by Kyle, and that misconduct alone justified Gray's termination. We reject this crammed view of but-for causation. State Farm concedes that Martin never questioned his team's time entries. And it admits that it investigated Gray only after Kyle reported her. Put differently, State Farm's proffered reason for firing Gray resulted from Kyle's alleged "antecedent" retaliation. *Sloat*, 18 F.4th at 213. A jury could conclude that State Farm would not have investigated and eventually fired Gray had Kyle not reported her.

## CONCLUSION

For all of the foregoing reasons, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

_____

## DISSENT

_____

CHAD A. READLER, Circuit Judge, dissenting.    "In our adversarial system of adjudication," we trust the parties to "advanc[e] the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (citation omitted).    That familiar understanding, otherwise known as the party presentation principle, reflects an important restraint on jurists:    "The parties," not judges, "frame the issues for decision."    *Id.* (citation modified).    We, in turn, "decide only questions presented by the parties."    *Id.* (citation omitted).

Doing so makes this an easy case.    On eight occasions in a single month, Monica Gray made manual fraudulent time entries, falsifying that she had returned to work from her lunch break when, in reality, she had not even swiped her badge to reenter the building.    Each time, Gray reported a phony break of either 49 or 50 minutes, knowing that a 51-minute entry would have netted her a disciplinary point for exceeding her allotted break time.    As Judge Marbley rightly concluded in granting State Farm's motion for summary judgment, no reasonable juror could view this evidence as anything but a calculated pattern of intentionally submitting doctored timesheets to avoid discipline.

In seeing things otherwise, the majority opinion fails to heed the settled limits on the judicial power.    Laboring to rehabilitate Gray's flawed appeal, the majority opinion resolves issue after issue in Gray's favor on grounds she never bothered to raise, with reference to evidence she never bothered to cite.    Rewriting the arguments presented to us is troubling enough.    *Berry v. Experian Info. Sols., Inc.*, 115 F.4th 528, 545 (6th Cir. 2024) (Readler, J., concurring in part and dissenting in part).    But the fallout from doing so should make the practice unbearable.    Embracing positions Gray never advanced plainly prejudices State Farm, who was not on notice that it needed to address those points with the Court.    And then consider Judge Marbley.    Reversing the district court based on arguments never made to it deeply disrespects that court's weighty efforts, which, in Gray's case, spanned more than three years, including a year dedicated to resolving State Farm's dispositive motion, a decision we now undo.    Taking the case as it was presented to us, the district court's judgment should be affirmed.

## I.

As Gray pursued this case in district court and presented the case to us on appeal, her efforts were not enough to overcome State Farm's summary judgment motion.  In a nutshell, Gray's theory was that State Farm retaliated against her by terminating her employment several months after she helped a disabled coworker oppose perceived ADA violations by that employee's manager, Joe Kyle.  Her analysis, in other words focused on her employer, State Farm, and its direct liability tied to its purported retaliatory efforts.

Viewing Gray's case through the familiar lens of the *McDonnell Douglas* burden shifting framework, we can accept her prima facie case of retaliation as well as State Farm's response, namely, that Gray was fired due to her scheme to falsify her time entries.  That takes us to step three of *McDonnell Douglas*.  At that point, Gray had to "produce sufficient evidence from which the jury" could "reasonably reject" State Farm's basis for terminating her as a mere "coverup" for retaliation.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083–84 (6th Cir. 1994).  She did not.  In Judge Marbley's words, "even if Ms. Gray can establish a *prima facie* case for retaliation, she cannot prove that State Farm's proffered reason for terminating her"—specifically, her "falsification of timecard entries"—"was pretextual."  *Gray v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-6038, 2024 WL 419001, at *6 (S.D. Ohio Feb. 5, 2024).

State Farm provided indisputable evidence documenting Gray's misconduct, justifying the company's decision to terminate her.  Based on discoveries initially made by Kyle, who was temporarily assigned to oversee Gray's work, and as later confirmed by State Farm in much greater detail, Gray reported working when she was not even badged into the building on each of November 3, 8, 9, 15, 17, 22, 24, and 27.  On all but one of those occasions, she claimed a false lunch break of exactly 49 or 50 minutes—immediately under the 51-minute disciplinary cutoff.  If she had reported her actual lunch breaks, she would have received enough attendance points to be terminated.  And her putative explanation for these events, which addressed only one of these many suspect entries, falls well short of providing "sufficient basis in the evidence" for the "jury [to] reasonably reject [State Farm's] explanation."  *Manzer*, 29 F.3d at 1083 (emphasis omitted).

Gray fails to counter this straightforward conclusion.  She contends that her time theft "was insufficient to warrant" termination, pointing to other employees she says committed similar misconduct, yet were not terminated.  *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (citation omitted).  But Gray was obligated to produce evidence that the comparator employees—Jill Dillon and Diane Parker—fell "outside [her] protected class."  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728 (6th Cir. 2004).  Her failure to demonstrate that Dillon and Parker did not engage in any ADA-protected activity, *see* 42 U.S.C. § 12203(a), is thus fatal to her comparator argument, *see Noble*, 391 F.3d at 728; *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056–57 (6th Cir. 2024) (explaining that "conjecture" and "conclusory accusations" on a necessary aspect of a plaintiff's claim are insufficient).  Nor did either coworker engage in "substantially identical conduct" to that committed by Gray.  *Jackson*, 814 F.3d at 779.  Perhaps, as Gray emphasizes, all three made numerous manual entries.  But compare that single shared characteristic with the other aspects of Gray's misconduct.  Gray does not claim, much less provide "significant probative evidence," *Walden*, 119 F.4th at 1057, that either Dillon or Parker, like Gray, (1) made entries inconsistent with their computer-activity software, (2) clocked in when they were out of the building, or (3) systematically changed their lunch breaks to the maximum allowed.  Those realities distinguish the "severity of [Dillon's and Parker's] actions" from Gray's, making the pair poor analogies for proving that Gray's course of conduct did not amount to a fireable offense.  *Jackson*, 814 F.3d at 780.

No more persuasive is Gray's assertion that her time theft did not "actually motivate the termination."  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000).  To prove as much, she must first "admit[]," for argument's sake, both "the factual basis underlying the discharge" and "that such conduct *could* motivate the dismissal."  *Id.*  Once we "acknowledge[]" these premises, *id.*, Gray's purported "significant evidence" of State Farm's illicit motivation all but melts away, Br. Appellant 54.  Two of her contentions—that State Farm and manager Chris Martin respectively rejected her attempted explanations for her unusual timekeeping practices— directly contest, rather than "admit[]," as she must, the "factual basis underlying" her firing. *Smith*, 220 F.3d at 759.  Nor, if we accept that Gray committed fireable time theft, is there anything suspicious about State Farm acting on that information without launching further investigations into Kyle's actions or the behavior of other employees.  So too as to Martin's

apparent lack of candor to Gray during the investigation.  There is nothing nefarious in wanting to get all HR-related ducks in a row before notifying an employee that she will be fired.  Finally, that Kyle may have provided the HR investigator false information does not show that the State Farm decisionmakers (of whom Kyle was not one) used time theft as a coverup for their real motives.  In short, Gray has not provided evidence to demonstrate that State Farm acted pretextually.  That should end our analysis.

## II.

Resisting this straightforward conclusion, the majority opinion casts Gray's case in an entirely new light.  Ignoring the fact that Gray's legal arguments focus solely on State Farm's decision making, the majority opinion instead discerns two separate claims woven together "inartfully" in Gray's briefing:  one seeking to hold State Farm directly liable for its own actions and a distinct one seeking to hold it vicariously liable for Kyle's.  Maj. Op. 6–7 & n.2.  Conceding that the first theory, as shown above, is a non-starter, *id.* at 11, the majority opinion rests Gray's case on a theory tied to Kyle's motives rather than State Farm's.  Having recast Gray's case in this manner, the majority opinion then concludes that Gray's claims could prevail under a cat's paw theory of liability, which, in essence, would penalize State Farm—even if it had no discriminatory motives—for illicit motivations held by Kyle.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

The problem is that this now-all-important cat's paw claim is neither the case nor the strategy Gray pursued.  Rather, she framed her case as one presenting a theory of direct liability based on State Farm's own actions.  In response to State Farm's summary judgment motion, Gray did not raise the cat's paw notion as her theory of liability, let alone provide evidence on each essential element of the cat's paw claim on which she bore the burden of proof at trial.  *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020); *see also* 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2727.2 (4th ed. 2016).  Nor did she do so on appeal.  In neither setting did she mention the cat's paw theory to inform her prima facie case of retaliation.  And save for rebutting an alternative argument made by State Farm regarding pretext, one tied to the honest belief doctrine, Gray's pretext arguments likewise forwent any reliance on a cat's paw claim.  In other words, the cat's paw theory has played at most a fleeting role in Gray's case.

Unsatisfied with Gray's litigating choices, the majority opinion unilaterally remolds the afterthought cat's paw argument as the key legal theory that allows Gray to avoid summary judgment. In so doing, the majority opinion "shifts" the entire case's focus from the "motive[s]" of the "decisionmaker" (State Farm) to those of the "subordinate" (Kyle). Maj. Op. 6. This could not be further from the way in which Gray asked us to view her lawsuit.

A. To see why, first consider how Gray might have—but did *not*—present her lawsuit. Under our precedents, the cat's paw theory can play a very robust role in a retaliation case, providing a "theory of liability" that centers the entire analysis around the actions of the "biased subordinate" rather than the employer. *Marshall v. Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017). The "cat's paw theory," we have explained, ultimately represents an "application of respondeat superior principles." *Bose v. Bea*, 947 F.3d 983, 991 (6th Cir. 2020). Today's majority opinion, which utilizes the cat's paw doctrine in this broader role, is a good example. In sending Gray's claim forward to the jury, the majority opinion does so not to hold State Farm directly liable for its own actions but to potentially hold the company "vicarious[ly] liab[le]" based on retaliation by Kyle—a non-decisionmaker in Gray's termination. Maj. Op. 1. Yet Gray never asked us (or the district court) to do so. In fact, she never mentioned the supposedly key notion of "vicarious liability" either in the district court or on appeal, let alone made the arguments needed to support such a theory.

Simply put, Gray never made an affirmative case on any of the cat's paw elements. By way of background, the Supreme Court has authorized liability in this context only when (1) "a supervisor" (2) "performs an act motivated by [retaliatory] animus" that is both (3) "*intended* by the supervisor to cause an adverse employment action" and (4) the "proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422. Gray barely hints at any argument on these elements.

Take the last element—proximate cause—first. This requirement is key in any cat's paw case, because it demonstrates which biased employee actions can fairly serve as the basis of vicarious liability for the unbiased company. *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015). Yet Gray never made the case to Judge Marbley that there was a "direct relation" between Kyle's actions and her termination. *Staub*, 562 U.S. at 419–20 (quotations omitted).

And the only references to "proximate cause" in her appellate briefing are tucked inside a long block quote, otherwise going undiscussed in the surrounding text. Br. Appellant 51. At best, the two paragraphs that follow this block quote are obliquely aimed at rebutting one of State Farm's arguments *against* proximate cause—namely that its "independent investigation cut[] off any retaliatory animus." *Id.* at 52. But Gray never makes any argument *for* proximate cause as part of a broader cat's paw case. As this critical aspect of cat's paw liability confirms, Gray did not frame her case around an affirmative cat's paw theory, as the majority opinion does.

Doing so, as would the majority opinion, raises a host of other unbriefed questions as to the remaining cat's paw elements. We must ask, for instance, was Kyle "a supervisor"? *Staub*, 562 U.S. at 422 & n.4 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998)). And did he have the "specific intent to cause" Gray's termination, either by "desir[ing] to cause" that "consequence[]" or by being "substantially certain" it would "result from" his actions? *Id.* at 422 & n.3 (quoting Restatement (Second) of Torts § 8A (A.L.I. 1965)). Gray addresses neither point, again belying any notion that she pursued a case of vicarious liability. Nor, understandably, did Judge Marbley, with Gray never raising those issues in district court (or here).

Cementing the point is Gray's framing of the threshold *McDonnell Douglas* inquiry that leads off her case. *Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022). At that stage, to make the broad cat's paw argument envisioned by the majority opinion, Gray would use the burden-shifting framework to satisfy the remaining requirement from *Staub*—i.e., to show that Kyle "perform[ed] an act motivated by [retaliatory] animus." *Staub*, 562 U.S. at 422. In other words, she would need to first "appl[y] . . . the *McDonnell Douglas* framework to [her] allegations *against [Kyle]*." *Marshall*, 854 F.3d at 381 (emphasis added). Only then, after determining that Gray can create a jury issue on "each step of the *McDonnell Douglas* burden-shifting test" to support her "allegation that [Kyle] was biased against her," would we move on to analyze State Farm's vicarious liability for Kyle's illegal motives by analyzing proximate cause, supervisor status, and intent. *Id.* at 383; *see also Staub*, 562 U.S. at 422. Yet Gray's *McDonnell Douglas* arguments uniformly attempt to cast State Farm's actions as retaliatory—not Kyle's.

Turn to the first *McDonnell Douglas* threshold, where Gray's prima facie case required her to establish a causal link between her "protected activity" and some subsequent "adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Whose "action" did she choose? *Id.* State Farm's, not Kyle's. The purportedly retaliatory act she identified was her termination—an action taken exclusively by State Farm. *See* Br. Appellant 33 (arguing that "State Farm took an adverse employment action against her when it terminated her employment"); *see also id.* at 60 (Gray admitting Kyle was not one of the "decisionmakers" who terminated her). In tying her prima facie case to State Farm's allegedly retaliatory response to Gray's protected activity, in other words, Gray, to prevail, must demonstrate that State Farm (not Kyle) retaliated against her. If Gray had instead preferred to rest her case on Kyle "perform[ing] an act motivated by" retaliation, as the majority opinion now does, it was her duty to identify that "act" and provide prima facie evidence that *it* was "motivated by" retaliation. *Staub*, 562 U.S. at 422; *Marshall*, 854 F.3d at 379–80. She did not do so.

Gray's remaining prima facie arguments sing the same tune. Take, for example, the lead heading in Gray's appellate brief. It asserts that "State Farm Retaliated against Gray" and, tellingly, never mentions Kyle. Br. Appellant 21 (bold omitted). Or ponder the fact that two of Gray's claimed "protected activities" occurred on December 12 and 24, with any role played by Kyle having ended, at the latest, on December 4. To the same end, in arguing that "State Farm was aware of [her] protected activity," *id.* at 27 (underline omitted), Gray identified four State Farm employees (in addition to Kyle) with the requisite knowledge. These are odd choices if Gray's case turned on Kyle's retaliatory mental state rather than that of the company in general. And, again, Gray argues only that "State Farm"—not Kyle—"took an adverse employment action against [her] when it terminated her employment." *Id.* at 33 (underline omitted). Fairly read, Gray's prima facie briefing seeks only to hold State Farm directly liable for its own actions rather than vicariously so for Kyle's.

Her pretext arguments echo this theme. Over and over, they focus on State Farm's justification for its actions rather than Kyle's justification for his. Br. Appellant 46 (querying whether "State Farm fire[d] Gray for the stated reasons or not"); *id.* at 49–50 (disputing whether "State Farm had an honest belief"); *id.* at 54–55 (arguing pretext based on circumstances "State

Farm never investigated" and facts "State Farm knew"); *id.* at 58 (arguing that "State Farm treated Gray's coworkers more favorably"). Demonstrating that "State Farm['s] . . . stated reasons" for firing Gray were pretextual, as Gray seeks to do, would support an effort to hold State Farm liable for its own actions. *Id.* at 46. But it does nothing to show that Kyle was "motivated by . . . animus" or, accordingly, that State Farm can be held vicariously liable based on his distinct actions. *Staub*, 562 U.S. at 422.

Were there any doubt on that score, look back to Gray's summary judgment response in district court. There, Gray similarly painted her prima facie case focused on the theory that "State Farm retaliated" based on evidence that "State Farm knew about Ms. Gray's protected activity" and that "State Farm took an adverse employment action against Ms. Gray." Pl.'s Mem. Opp'n Defs.' Mot. Summ. J., R. 42, PageID#3174, 3181, 3186 [hereinafter Summ. J. Opp'n] (formatting omitted). As here, she did not purport to elevate the cat's paw argument as informing her overriding theory of retaliation. Nor, by and large, did Gray emphasize Kyle's actions as part of her broader pretext analysis in the district court; she made two different pretext arguments before even thinking to mention the cat's paw theory and Kyle's corresponding relevance. And, as in her appellate brief, Gray's pretext arguments before Judge Marbley almost without exception asked the district court to evaluate State Farm's motives, not Kyle's. *Id.*, PageID#3201 (targeting "State Farm's proffered reasons" and asking whether "State Farm fire[d] Ms. Gray for the stated reasons"); *id.*, PageID#3203 (citing evidence that "State Farm's offered reason . . . was pretextual"); *id.*, PageID#3204 (discussing whether "State Farm . . . honestly believed that Ms. Gray committed time theft"). At every turn, in other words, Gray targeted State Farm's retaliatory conduct and forwent any attempt to "appl[y] the *McDonnell Douglas* framework to [Gray]'s allegations against [Kyle]." *Marshall*, 854 F.3d at 381.

Gray's understanding of her case is confirmed yet again in the separate state claim she brought against Kyle for aiding and abetting retaliation. *See* Ohio. Rev. Code Ann. § 4112.02(J) (2025). In arguing that Kyle can be held liable on that basis, Gray characterizes her previous argument under the ADA as demonstrating that "*State Farm* retaliated against Gray," a fact which allows her to further conclude that "*Kyle* is liable for aiding and abetting retaliation." Br. Appellant 59 (emphasis added). These statements would be perplexing if they came from a

litigant who purportedly sought to hold State Farm vicariously liable for Kyle's retaliation rather than directly liable for its own.

B.   By comparison, Gray's mentions of the cat's paw theory in this litigation were fleeting.  Unearthing her actual use of the cat's paw theory requires significant spadework.  Both in district court and on appeal, Gray and State Farm primarily quarreled over the nature and severity of Gray's misconduct and whether State Farm was justified in terminating her on that basis, or whether State Farm instead was motivated by a retaliatory animus due to Gray's earlier support for a disabled employee.  At one point deep into this back and forth on appeal, Gray claimed that State Farm's "assertion that [she] falsified her timecards" was "factually false."  Br. Appellant 47 (underline omitted).  State Farm, of course, firmly believed that its allegation was true, and explained as much.  But even if it was not, State Farm added, the company had an "honest belief'" that the misconduct occurred, an alternative basis for overcoming Gray's assertion of pretext.  Br. Appellees 54.

A few words, then, on the honest belief doctrine.  The concept applies in a targeted way to a small set of employment disputes.  Sometimes, an employee may attempt to show that her employer acted in a pretextual manner by disciplining the employee for conduct that "never happened."  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 889 (6th Cir. 2020).  If an employee "provide[s] evidence that the employer's allegations" are in fact false, the employer, "as a defense to [the] lack of a factual basis," may still "defeat [the] pretext claim by showing that it had an 'honest belief' in the" reason it asserted for disciplining the employee.  *Id.* at 889, 890 n.5 (citation omitted).  State Farm invoked the doctrine here, explaining that even if Gray were correct that her misconduct never happened, the company honestly believed that it did, shielding it from liability.

Only at this late stage in the parties' respective arguments do we reach what the majority opinion now features as the main event.  In a defensive posture, Gray injects the cat's paw theory—and narrowly at that.  Turn to page 50 of her 60-page opening brief on appeal. Anticipating and responding to State Farm's reliance on the honest belief rule, Gray mentions "the cat's paw theory of liability" because "the honesty of [State Farm's] belief does not matter" if the cat's paw theory applies.  Br. Appellant 50–51 (quoting *Marshall*, 854 F.3d at 380–81 ).

This cat's paw point, in fact, was not even Gray's leading challenge to State Farm's honest belief assertion—it was the "[s]econd" of her two reasons that "the District Court erred" in holding that "State Farm had an 'honest belief'" that she falsified her timecards. *Id.* at 50. And Gray presented the argument as tied merely to a factual dispute, burying it under a heading that read "State Farm's assertion that Gray falsified her timecards is factually false." *Id.* at 47, 49–50 (underline omitted). In short, Gray raised the cat's paw theory merely as a rebuttal point to arguments regarding the last step of the *McDonnell Douglas* three-step analysis. We should respect that decision.

Given the limited way in which Gray utilized the cat's paw theory, it makes sense that she put no legwork into proving its requirements for demonstrating vicarious liability. *See Staub*, 562 U.S. at 422. For instance, she neither describes what she must prove to succeed in a cat's paw case nor links those requirements to the record in this case. *See* Br. Appellant 50–52. Instead, she "discusse[s] the relationship between the cat's paw theory and honest belief" only to challenge State Farm's counterargument about its "independent investigation." *See id.*

Gray's confined reliance on the cat's paw theory is confirmed by her briefing in district court. There, as here, Gray's reliance on the cat's paw notion was far from a leading light, first surfacing 72 pages into her 78-page summary judgment response brief, long after the parties conducted their debate over Gray's asserted prima facie case of retaliation and had moved on to Gray's response to State Farm's asserted nonretaliatory basis for her termination. And when she finally introduced the idea, she did so only to rebut State Farm's assertion of honest belief, dedicating just one paragraph to describing the logic behind the theory before spending the next page and a half arguing that it precludes reliance on honest belief. As already explained, had Gray instead opted to make wider use of a cat's paw theory, as the majority opinion now does, she would have needed to, among other things, list the elements of cat's paw liability and connect those elements to record evidence, as was her duty at summary judgment. *See Viet*, 951 F.3d at 823; *see also Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) (Wood, J.) (plaintiffs seeking to avoid summary judgment in a cat's paw case must "make a specific argument" "inform[ing] the trial judge of the reasons, legal or factual, why summary

judgment should not be entered," rather than merely stating their "intent to use a cat's paw theory" in "general terms").

C.  Finally, consider the most troubling aspect of reframing the case in this manner—that Gray's briefing never gave State Farm or Judge Marbley a fair chance to respond to the Kyle-centric case the majority opinion now embraces.  Start with State Farm.  Because Gray did not brief her theory of retaliation as resting on Kyle and his role as the shadow director of the cat's paw, State Farm similarly did not brief the case in that fashion.  Again, Gray invoked a cat's paw argument only in response to State Farm's assertion of the honest belief doctrine.  Taking Gray at her word, State Farm similarly relegated its own short cat's paw discussion to a subheading under its "Honest Belief" argument.  Br. Appellees 54, 60.  And it did so, it bears noting, only as a fallback position—its honest belief "defense" was an alternative argument to its lead theory, again, that Gray failed to make the initial showing that the allegations against her had "no basis in fact." Br. Appellees 54; *see also Miles*, 946 F.3d at 890 n.5.  That makes Gray's cat's paw point merely a rebuttal to a secondary argument.

The remainder of State Farm's briefing confirms that it understandably took Gray at her word in limiting her cat's paw argument to the issue of honest belief.  State Farm's *McDonnell Douglas* arguments, like Gray's, focus on the company's actions and motives—debating, for example, whether "State Farm's decisionmakers knew about" Gray's protected activity and whether "State Farm's termination decision was a pretext."  Br. Appellees 32, 52 (formatting omitted).  Proof positive that State Farm fairly detected no overarching invocation of cat's paw liability comes in its prima facie case argument, where it asserts that "Kyle was wholly uninvolved in . . . the decision to terminate Gray's employment."  *Id.* at 34.  The point addresses the case Gray argued—one based on holding State Farm directly liable for its own actions.  But it would be a nonsensical response to a case premised entirely on the cat's paw theory and vicarious liability.

And let us not forget Judge Marbley.  By failing to make a broad, threshold cat's paw argument in district court, Gray never asked Judge Marbley to find that "each step of the *McDonnell Douglas* burden-shifting test" supported her "allegation that [Kyle] w[as] biased against her."  *Marshall*, 854 F.3d at 383.  Accordingly, Judge Marbley's opinion, like State

Farm's briefing, understandably responds to Gray's State Farm–framed arguments.  *See Gray*, 2024 WL 419001, at *3 (describing Gray's "circumstantial evidence that State Farm discriminated against her"); *id.* at *4 (discussing whether "State Farm knew about [Gray]'s protected activity"); *id.* at *6 (noting Gray's inability to "prove that State Farm's proffered reason for terminating her was pretextual").  All of this well illustrates why points not made in district court are ordinarily foreclosed on appeal.  *See Glennborough Homeowners Ass'n v. USPS*, 21 F.4th 410, 414 (6th Cir. 2021).

D.  How does the majority opinion explain all of its norm-breaking?  It shrugs these widespread concerns aside in a single footnote.  Maj. Op. 6–7 n.2.  Of the very few points made there, one is the entirely unhelpful admission that Gray never used critical phrases like "vicarious liability" or—except in the limited context noted above—"cat's paw," notions that, we are nonetheless told, Gray "invokes" as the key facet of her case.  *Id.* at 6 & n.2.  Despite these blaring omissions, the majority opinion portrays Gray as having raised the cat's paw theory "again and again" in her appellate and district court briefing.  *Id.* at 6 n.2.  Again and again, by my count, amounts to just five occasions, scattered across 175 pages of briefing between the two courts (in other words, once every 35 pages of briefing).  Two are the exact passages discussed above, again, tied narrowly to rebutting the honest belief rule.  One is Gray's repetition of that argument in her reply brief.  And the final two are simply the same point, regurgitated in the "Summary of the Argument" sections of Gray's principal briefs here and in the district court.  In short, Gray's briefing, fairly portrayed, alludes to the cat's paw issue hardly at all, and only in the context of her honest belief argument.

True, as the majority opinion emphasizes, Gray does mention Kyle's role in her termination at various points in her papers.  Taking an inch to leap a mile, the majority opinion understands those references as meaning only one thing:  that Gray's "inartful[]" briefing includes an unlabeled, unexplained affirmative cat's paw claim.  *Id.* at 6–7 n.2 (quotation omitted).  I can think of a far more plausible explanation:  Kyle was Gray's fill-in supervisor when her time theft was noticed and dealt with.  It is thus hardly surprising that Gray's briefing, while singularly focusing its affirmative legal theories on State Farm's decision to terminate her, would mention facts involving Kyle that led up to that action.  But Gray's recitation of Kyle's

name does not mean that she otherwise silently tied her overarching legal theory to his acts. Equally true, that some of Kyle's actions *could* be packaged to potentially support a distinct cat's paw claim does not license us to moonlight as quasi-detectives, quasi-prosecutors, investigating the record for any clues that might fill out an unargued legal theory for us to assert on Gray's behalf.

On this point, it bears emphasizing that the dispute here is not merely one over whether Gray "forfeit[ed]" an argument, as the majority opinion declares. *Id.* at 6 n.2. Rather, the issue is far more fundamental: Gray, in responding to State Farm's summary judgment motion, never "invoke[d]" the overarching legal theory her case purportedly depends on. *Id.* at 6. Keep in mind the blackletter understanding that as the "nonmoving party," Gray, to avoid summary judgment, was "require[d] . . . to do [her] own work." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 (6th Cir. 1992). So had Gray in fact sought to avoid summary judgment by anchoring her case to the cat's paw theory, she had to identify the theory and then "demonstrate" each of its elements by "set[ting] forth specific facts showing a triable issue," conditions we ordinarily enforce without hesitation. *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 783 (6th Cir. 2024) (Bloomekatz, J.); *accord. Franklin v. Franklin County*, 115 F.4th 461, 470 (6th Cir. 2024) (Gilman, J.).

Gray and her counsel opted not to do so. Instead, she confined her cat's paw argument to a rebuttal point within a case she framed around State Farm's (not Kyle's) actions. Unlike the majority opinion, I would honor that litigating choice. *See Sineneng-Smith*, 140 S. Ct. at 1579. "[W]e [should] take [Gray's] case as it is, not as we might think it could be." *Berry*, 115 F.4th at 544 (Readler, J., concurring in part and dissenting in part).

Nor can State Farm shoulder Gray's summary judgment burden for her, as the majority opinion oddly seems to suggest. With little to point to in Gray's summary judgment briefing, the majority opinion instead seizes on State Farm's citation of *Staub* in a single paragraph of its summary judgment motion. Maj. Op. 6 n.2. But State Farm cited the case merely to counter one of many possible causation arguments Gray might raise in opposing summary judgment. That is all. State Farm never mentioned the cat's paw theory, much less suggested that it might control the entire case. In any event, whatever State Farm did (or did not) say in its brief could not

absolve Gray of *her duty* to articulate the theories she relied on to avoid summary judgment, and to lay out the elements of those claims. *Guarino*, 980 F.3d at 406.

The point here is thus not about magic words. Maj. Op. 7 n.2 (quoting *Coffee v. Carroll*, 933 F.3d 577, 586 (6th Cir. 2019)). Instead, it is about articulating basic elements and claims so that the parties and the court have fair notice of what issues underlie the litigation, and are thus ripe for resolution. That is the least we ask of parties. Not surprisingly, the majority opinion's citations do not say otherwise. Indeed, even if one were to view the issue here as merely a matter of forfeiture, as does the majority opinion, *Coffee* did not conclusively decide whether oversights like Gray's required a finding of forfeiture because, giving those defendants the benefit of the doubt on the question, the panel rejected their arguments on the merits. *Coffee*, 933 F.3d at 586. I would be happy to follow a similar practice here. But waving aside presentation concerns only to find the possibly forfeited theory *successful* is quite another matter. Alternatively, if Gray in fact asserted a cat's paw claim in district court, one that inadvertently went unruled upon, our standard course would be to remand for the district court to "resolve[]" the matter "in the first instance." *Stanek v. Greco*, 323 F.3d 476, 480 (6th Cir. 2003); *see also United States v. Kimbrough*, 138 F.4th 473, 480 (6th Cir. 2025) ("We are a court of review, not first view." (citation modified)). But even that customary practice is jettisoned by the majority opinion, all in the name of advancing Gray's case to trial.

In the end, the majority opinion finds this mountain of concerns "puzzling." Maj. Op. 6 n.2. Of course, the majority opinion must be equally puzzled by Judge Marbley, who similarly detected no hint of a cat's paw claim in his handling of the case, which spanned more than three years, far longer than we have spent with the matter. *See generally* Op. & Order, R. 52 (never mentioning "cat's paw" or "vicarious liability"). Yet in reversing the district court, the majority opinion curiously fails to describe what error Judge Marbley in fact committed. This too is far from regular order. Customarily, we defer to a district court's assessment of what issues were raised before it, and when. *See Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 692 (6th Cir. 2012). An ounce of that same deference would make sense here as well, where Judge Marbley's summary judgment opinion necessarily determined that Gray never raised a cat's paw claim. Yet far from receiving the benefit of the doubt, Judge Marbley instead is now being

reversed for an error the contours of which the majority opinion never bothers to explain. Puzzling indeed.

## III.

The decision to rewrite Gray's lawsuit is all the more curious when one realizes that, had Gray in fact pursued her retaliation claim under a cat's paw theory, with Kyle's purported animus imputed to State Farm, as the majority opinion now puts forward, she still could not prevail. Turn from Gray's case as pleaded to the one depicted in the majority opinion—namely, one in which the cat's paw doctrine frames the analysis from stem to stern around the motives of "the subordinate," Kyle, rather than "the decisionmaker," State Farm. Maj. Op. 9. Even in this artificial construct, Gray could not demonstrate two of the requirements for cat's paw liability: retaliatory motive and proximate cause. *Staub*, 562 U.S. at 422.

A. Consider first whether Kyle was "motivated by [retaliatory] animus" when he first brought Gray's timekeeping issues to light. *Id.* As noted above, our cat's paw case law requires Gray to first marshal her circumstantial evidence of Kyle's retaliation through the steps of *McDonnell Douglas*. *Marshall*, 854 F.3d at 379–81. In other words, only if Gray (1) presents a prima facie case of retaliation and (2) shows that Kyle's offered reasons are pretextual may she move on separately to trying to prove the cat's-paw-specific requirements of proximate cause, intent, and supervisor status (the latter two, although not contested here, likely could be, as explained later). *Id.*; *see also Staub*, 562 U.S. at 422. Gray's case, as now constructed by the majority opinion, stumbles in multiple respects.

1. Beginning with Gray's burden to establish a prima facie case of retaliation, reframed under the cat's paw theory to focus on Kyle rather than State Farm, Gray would have to show that her (1) protected activity, of which (2) Kyle was aware, was (3) the but-for cause of (4) the action he took against her. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698–99 (6th Cir. 2013). Steps one and two may be conceded, as Gray took protected activity by opposing perceived ADA violations, facts of which Kyle was seemingly aware.

Things get more difficult from there. What "act" did Kyle "perform[] . . . motivated by" retaliation? *Staub*, 562 U.S. at 422. That is, what was the relevant act on which to focus this

prima facie showing of intentional retaliation?  *A.C. ex rel. J.C.*, 711 F.3d at 698–99.  As noted by the majority opinion, Kyle was not "the decisionmaker" who fired Gray.  Maj. Op. 6.  True, he did "report" "Gray to Human Resources."  Br. Appellant 4.  Yet Gray has acknowledged that Kyle did so at the behest of his supervisor, who both "advised" Kyle to investigate Gray's time entries beyond the initial three he flagged, and ultimately "told [him] to contact HR."  Summ. J. Opp'n, *supra*, R. 42, PageID#3153–54.  Gray's failure to point to any other action by Kyle alone likely sinks her hypothetical cat's paw claim, as Kyle's report to HR was indisputably motivated by obedience to a superior's direct order, and thus not evidence of retaliation.

We could generously elevate an action that Kyle did take on his own prerogative (and thus that might have been motivated by personal animus):  the earlier decision to flag three of Gray's time entries that he "was not quickly able to resolve in [his] mind," by taking them to his supervisor and saying, "[T]his is what I found.  What would you like me to do?"  Kyle Dep., R. 30-21, PageID#1953; *see also* Summ. J. Opp'n, *supra*, R. 42, PageID#3153 (Gray describing similar facts in district court).  Even then, that leaves us to ask whether Gray's protected activity was the but-for cause of Kyle flagging these time entries.  The majority opinion believes it was, characterizing Kyle's actions as "heightened scrutiny" of previously ignored conduct, which, coming in the wake of Gray's protected activity, allows for an inference of causation.  *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).  Concluding as much is problematic for two reasons.

For one, Gray made this argument only in her reply brief.  Her opening brief never mentions "heightened scrutiny," never cites any of the majority opinion's case law on this point (save for one case, in an unrelated context), and never develops any argument under this theory.  And in district court, she never mentioned the point whatsoever.  Rather, Gray's causation arguments, both in her opening appellate brief and before Judge Marbley, focused solely on comparator evidence and temporal proximity.  This double "omission" results in double "forfeiture" of the heightened scrutiny argument, *see Glennborough Homeowners Ass'n*, 21 F.4th at 414, a reality the majority opinion ignores.

For another, even had the issue been preserved, a heightened scrutiny theory does not apply here.  To demonstrate as much, Gray needs evidence that Kyle's review of her timesheets

departed from his previous practices.  *See, e.g.*, *Hamilton*, 556 F.3d at 432 (finding causation because the plaintiff's supervisors "harassed him more than *they* ever had before" (emphasis added)).  She has not presented any.  Gray's heightened scrutiny argument to us, referenced only in reply, does not mention Kyle's previous practice in reviewing timesheets.  Even more problematic is her district court briefing, which in essence concedes the issue, emphasizing that Kyle consistently took a strict approach to employee time entries, "expect[ing] his Claims Specialists to let him know any time they manually enter[ed] time."  Summ. J. Opp'n, *supra*, R. 42, PageID#3152.  Kyle's testimony confirmed as much.  Unlike Chris Martin, Gray's normal manager, Kyle made a practice of reviewing the computer activity software that revealed Gray's falsifications.  In Kyle's words, "[T]his is what I do, you know.  This is normal for me."  Kyle Dep., R. 30-21, PageID#2035.  Without evidence that Kyle's efforts marked "intensified" analysis, Gray cannot succeed on this theory of causation.  *Hamilton*, 556 F.3d at 432.

The majority opinion tries to sidestep this problem by asking us to direct our attention to Martin's managerial practices rather than Kyle's.  The move is understandable, given that Martin's "very laid back" managerial philosophy, as Gray put it, contrasted sharply with Kyle's.  Summ. J. Opp'n, *supra*, R. 42, PageID#3152.  But mere interpersonal contrast is not the stuff of heightened scrutiny.  Typically, a heightened scrutiny–based causal argument takes the following form:  The manager did not care about the behavior before the protected activity.  He did care after.  The inference?  The protected activity is what caused him to change his approach.  *See, e.g.*, *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1070 (6th Cir. 2015) (citing evidence that "prior to [the plaintiff's] rejection of [her manager's] sexual advances, [he] had no problems with [her] tardiness").  Note the very different story here:  A lazy manager (Martin) did not care about checking timesheets.  He was replaced by a strict one (Kyle) who did.  What inference does this allow?  Only that Kyle took this managerial duty more seriously than Martin did.

Just ask Gray.  She conceded that Kyle "never asked Mr. Martin about his policy on manual entries" and "was not aware of Mr. Martin's expectations of his team" on that front.  Summ. J. Opp'n, *supra*, R. 42, PageID#3152.  With this in mind, Gray's complaints about the "common practice for Martin's team," Reply Br. Appellant 17, 21, do not help discern Kyle's motivations.  Kyle's attention to detail may have been upsetting to Gray, as it may be for any

employee suddenly overseen by a by-the-book manager. But, again, these distinctive management styles are not evidence that Kyle's "scrutiny" ever "intensified," *Hamilton*, 556 F.3d at 432, or, it follows, that Gray's protected activity caused him to flag her time entries.

2. The majority opinion fails to clear a similar hurdle at the pretext stage. Assuming Gray could prove causation, Kyle easily satisfies the next *McDonnell Douglas* step by articulating a "legitimate, non-discriminatory reason[]" for reporting Gray to his supervisor. *Miles*, 946 F.3d at 887. Namely, he spotted a "pattern" of Gray (1) "changing mealtimes . . . with a manual entry" of (2) "49 or 50 minutes" that (3) "did not align with her computer activity." Defs.' Reply Supp. Mot. Summ. J., R. 43, PageID#3691. (Note, of course, that I am reconstructing Kyle's offered justification from the record and State Farm's briefing. *E.g.*, Br. Appellees 49–50. Because, as noted above, Gray never focused her *McDonnell Douglas* arguments on Kyle, State Farm's pretext arguments understandably discuss only *its* reason for firing Gray, not Kyle's earlier reason for flagging her time entries. *See id.* at 52.) That leaves it incumbent upon Gray to demonstrate that this justification was pretext. *Miles*, 946 F.3d at 887. Neither she nor the majority opinion can do so.

Consistent with our cat's paw precedent, the majority opinion's effort to save Gray's case falters at the pretext stage if Kyle had an "honest belief" in this pattern of deceptive entries that "justified adverse action against" her. *Marshall*, 854 F.3d at 380 n.3. Conversely, it can succeed here by showing (1) that Kyle lacked an honest belief that Gray engaged in the conduct noted, or (2) that this observation did not justify referral to Kyle's supervisor. *Id.*

a. Beginning with the first consideration, Kyle's honest belief that Gray misreported her lunchbreaks is above reproof. *See* Maj. Op. 11–12. So is his related belief that these entries showed a pattern of ducking in just under the disciplinary cutoff. As Kyle has repeatedly explained, it was this entire pattern of events, not Gray merely "overstat[ing] her time," *id.*, that caught his attention, *see* Kyle Dep., R. 30-21, PageID#1984 ("Why put 50 minutes is the first thing that comes to my mind. . . . 50 is significant, because . . . if she would have manually input [one minute later], she would have been assessed points. . . ."); *id.*, PageID#2015 ("[S]eeing the multiple 50 minutes manual adjustments, . . . [i]t's an indicator that potentially we have a problem."); Kyle Decl., R. 43-2, PageID#3712 ("[W]hat caught my attention was the pattern of

Plaintiff changing meal times . . . with manual entry of 49[-] or 50-minute meals that did not align with her computer activity.").

State Farm's computer and timekeeping records confirm the point. As those records demonstrate, Kyle saw Gray manually enter inaccurate lunch breaks of exactly 50 minutes on each of November 22, 24, and 27. All things considered, it was more than "reasonabl[e]" for Kyle to "honestly rel[y]" on these "particularized facts" in concluding that Gray habitually changed her lunch breaks to fall right under the time limit. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009).

b. That leaves whether Kyle's "honest belief . . . justified" his actions, *see Marshall*, 854 F.3d at 380 n.3—that is, whether the pattern he noted was "[]sufficient to warrant" consulting his supervisor, *Jackson*, 814 F.3d at 779 (citation omitted). To show it was not, Gray would have to provide "evidence that" Kyle did not flag the time entries of "other employees," who were (1) "not in [Gray's] protected class," even though (2) "they engaged in substantially identical conduct." *Id.* at 779. The majority opinion cites just one such employee—Parker. But as a comparator, Parker falls short in both respects.

To start, Gray, as already discussed, failed to "produce[] . . . evidence as to . . . whether" Parker "was outside the . . . class" of people who take "protected" action under the ADA. *Noble*, 391 F.3d at 731. Nor, for similar reasons, did Gray show that Parker's time entries, as reviewed by Kyle, were "substantially identical" to hers. *Jackson*, 814 F.3d at 779. Recall that Gray's evidence failed to prove as much as to State Farm's decision. The same applies to Kyle's decision. Focusing only on "manual entries for meals," as does Gray, Br. Appellant 40, disregards two key facets of Kyle's explanation that distinguish "the severity of" Gray's and Parker's "actions," *Jackson*, 814 F.3d at 780—namely that Gray's entries did not align with her computer activity, and that they demonstrated a pattern of 50-minute breaks.

Enter, once again, the majority opinion. Unlike Gray, the majority opinion detects "enough evidence of differential scrutiny," Maj. Op. 12, by changing the focus from the "manual entries" Gray pointed out, Br. Appellant 40, to the "discrepancies" between the time each employee entered and the time reflected on the computer-activity software, Maj. Op. 12. Gray's

appellate briefing, it bears emphasizing, never mentioned discrepancies in Parker's timekeeping records, let alone argued that Parker was comparable on that basis. Ordinarily, we accept the fundamental "premise" that a party "know[s] what is best for [her]" and is "responsible for advancing the . . . argument entitling [her] to relief." *Sineneng-Smith*, 140 S. Ct. at 1579 (citation omitted). We likewise routinely consider arguments made in district court but abandoned in a party's appellate briefing forfeited. *Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). Yet the majority opinion jettisons this foundational practice too, instead suggesting that Gray's listing of Parker's discrepancies "in bullet points before the district court" properly presents *to us* a discrepancies-based argument for review. Maj. Op. 13. Here too, our departure from longstanding precedent is left unexplained.

Indeed, not only has Gray not made the legal argument forged by the majority opinion, but she has also failed to offer evidence to prevail on the point. On the comparator issue, Gray cited only two documents—Parker's complete timesheet audit for 2017 and a chart Gray prepared for litigation, summarizing all of Parker's manual entries for the year. Conspicuously absent from Gray's presentation is any mention of the computer-activity software, the item the majority opinion now embraces to discern "discrepancies" in Parker's timesheets. Utilizing software printouts neither cited nor discussed by Gray, the majority opinion tediously works up calculations it believes support its own theory of retaliation. *Compare* Maj. Op. 13 (citing Summ. J. Opp'n, *supra*, Ex. 11, R. 42-11), *with* Br. Appellant (not doing so), *and* Reply Br. Appellant (same). Disrespecting Gray's "strategic litigation choice," which focused on manual entries, is unusual enough. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2239 n.21 (2023) (Sotomayor, J., dissenting) (citation omitted). Compiling data Gray never deployed only compounds the matter, wholly absolving Gray of her "responsib[ility] for advancing the facts" needed to support this now-rewritten argument. *Sineneng-Smith*, 140 S. Ct. at 1579.

Ironically, even the majority opinion's manufactured focus on "discrepancies" does not establish that Kyle observed Parker and Gray committing "substantially identical" misconduct. *Jackson*, 814 F.3d at 779. Through its calculations, the majority opinion derives one metric of arguable comparability: "Parker's 15-to-16-minute discrepancies tracked the 6-to-17-minute

discrepancies that Kyle found in Gray's records." Maj. Op. 13. Fair enough. But focusing on this factor alone ignores Kyle's key reason for reporting Gray: her pattern of 50-minute lunchbreaks. In that way, the majority opinion's observations about "discrepancies" are as unresponsive as Gray's reflections on "manual entries."

Neither metric addresses the greater "relative severity" marked by Gray's pattern of entering the maximum time allowed. *Jackson*, 814 F.3d at 780. This practice, recall, was the "indicator" of "potential misrepresentation" "that got [Kyle's] attention." Kyle Dep., R. 30-21, PageID#1984–85. Parker, by comparison, never made a single 50-minute entry during the week Kyle reviewed her timesheets, much less a pattern of such entries, as did Gray.

Sweating none of the details, the majority opinion sees Gray's and Parker's lunch breaks as one in the same, as both reported breaks that "were at or just under the 50-minute limit." Maj. Op. 13. But details matter. Gray's altered lunch breaks during the relevant week were 50 minutes, 50 minutes, and 50 minutes. Parker's, on the other hand, were 40 minutes, 45 minutes, and 45 minutes. From Kyle's vantage point, Parker's entries displayed no discernible pattern— and certainly not the pattern of meeting the exact daily maximum time allowed, as did Gray's entries. Accordingly, Kyle did not ignore "virtually identical conduct" by Parker. *Id.*

B. The majority opinion similarly fails to demonstrate on Gray's behalf that Kyle's actions proximately caused her termination. Here, it needs proof of "some direct relation" between Kyle's flagging of her time entries and Gray's later firing. *Staub*, 562 U.S. at 419 (citation omitted). And any causal link, it bears noting, is cut off if Gray was ultimately fired because of information "of independent origin that was not foreseeable" to Kyle. *Id.* at 420 (citation omitted).

The majority opinion, to its credit, seems to acknowledge that the "three occasions" Kyle "discovered" were not the basis for Gray's termination. Maj. Op. 16. In other words, Gray was fired due to information that emerged later, that is, "other discrepancies" in her timekeeping as well as evidence of her "physical absences." *Id.* at 14, 16. As Kyle played no role in providing this later information, it is "of independent origin," dooming Gray's effort to demonstrate a causal link to Kyle's actions. *Staub*, 562 U.S. at 420 (citation omitted).

Resisting this conclusion, the majority opinion deems the information's emergence "foreseeable" to Kyle, *id.*, because he "anticipat[ed]" the discovery of "other discrepancies," Maj. Op. 16. This conclusion is yet one more Gray never asked us to draw. Neither in district court nor on appeal did she claim that Kyle foresaw HR discovering more time discrepancies than he reported. Having not made that argument, it is thus perhaps no surprise that she likewise did not cite the evidence the majority opinion relies on to make this point—a statement in a form Kyle sent to HR noting that he "noticed other errors" on "2 random days in October." Kyle Dep., R. 30-21, PageID#2104.

In this instance too, the argument the majority opinion crafts is as flawed as the (albeit different) one made by Gray. All things considered, the majority opinion fails to demonstrate that Kyle foresaw the investigation uncovering sufficient evidence to terminate Gray. Indeed, the majority opinion's cursory analysis here seems to push *Staub*'s proximate cause requirement towards a simple "but for" standard, under which an employer is liable "any time a biased employee . . . sets in motion the process that leads to an adverse employment action." *Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007). Kyle, it is true, "set[] in motion" the events that led to Gray's firing. *Id.* But what evidence do we have of a "direct relation" between his actions and Gray's termination? Maj. Op. 16 (quoting *Staub*, 562 U.S. at 419).

The majority opinion gives three examples. First, that Kyle selectively reported Gray for conduct "virtually identical" to Parker's. *Id.* This is a strained notion on its own, as shown above. But it is also inapt. That fact, if true, would show Kyle's bias. Yet it does nothing to show whether he foresaw the investigation uncovering additional evidence against Gray. Second, Kyle apparently conveyed a false claim about Gray's disciplinary history. *Id.* That too demonstrates very little about what he foresaw.

That leaves a third tenuous thread linking Kyle's actions and Gray's termination: the "other discrepancies" he noticed and reported to HR. *Id.* As an initial matter, Kyle detected these errors only after his supervisor instructed him to investigate, making their usefulness in showing what *Kyle* foresaw when he initially flagged Gray's entries doubly dubious. But more to the point, focusing on these errors elides Martin's role in this series of events. Martin, the manager who first decided to terminate Gray, testified that he did so because he learned that she

had reported working when she was not in the building.  In Martin's words, "telling me you're here when you're not" indicates an "integrity issue" that justifies "termination," not merely a "productivity" or "performance issue," which merits "counsel[ing] or coach[ing]."  Martin Dep., R. 30-12, PageID#1391, #1403.  Yet evidence of Gray's "physical absences," the majority opinion reminds us, "surfaced only after Kyle reported her," at which point HR pulled the "building-entry records" to which Kyle "lacked access."  Maj. Op. 12.  Without evidence that Kyle anticipated HR discovering that Gray was out of the building on these instances, that "[un]foreseeable" "cause of an independent origin" is also a "superseding" one.  *Staub*, 562 U.S. at 420 (citation omitted).

Having introduced an argument not made by Gray, the majority opinion then expands the underlying legal doctrine on proximate cause, seemingly crafting a bright-line rule that "report[ing] true but selective information" will "always" be the proximate cause of any subsequent employment action—no matter what information a later investigation uncovers.  Maj. Op. 17.  This case is a poor vehicle for doing so, as Kyle's report, again, was not selective—none of Gray's coworkers engaged in "virtually identical misconduct."  *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008).  And even if they had, the selective reports that served as "conduit[s]" for supervisor bias in past cases, *id.* (citations omitted), are different in kind from Kyle's.  In those instances, it bears emphasizing, the selective report provided the entire basis for the ultimate employment action, circumstances which the subsequent investigation "foreseeabl[y]" confirmed.  *Staub*, 562 U.S. at 420 (citation omitted).

Take *Madden*, for example.  There, a biased supervisor selectively reported that an employee had set off fireworks at work—the exact conduct for which the employee was later fired, even though it turned out to be a common form of delinquency.  *Madden*, 549 F.3d at 677.  The company's ensuing investigation merely confirmed the supervisor's allegations.  *Id.* at 678.  Given as much, the result of that investigation was obviously "foreseeable" to the supervisor—it was coterminous with his report.  *Staub*, 562 U.S. at 420 (citation omitted).  Likewise for *Chattman v. Toho-Tenax, America, Inc.*, 686 F.3d 339 (6th Cir. 2012), where a biased supervisor selectively reported the exact incident of horseplay for which the employee was disciplined.  *Id.* at 352–53.  The facts of that incident, as the supervisor could have foreseen, were later

confirmed following an investigation. *Id.* at 344, 352. In short, these cases do not displace the ordinary rule that an intervening cause cuts off liability when that cause was "not foreseeable." *Staub*, 562 U.S. at 420 (citation omitted). They merely apply it to the easy situation where the investigation reveals the same facts as reported.

Employing that same rule here yields a different result, given the intervening basis for Gray's termination. To that end, the conduct Kyle reported was not enough to terminate Gray, nor could he have foreseen the emergence of the evidence that did ultimately justify that decision. The investigation, in other words, did not merely "confirm [Kyle]'s allegation." Maj. Op. 17. Instead, the HR investigator uncovered additional, indisputable evidence that turned the discrepancies Kyle flagged from what he called a "concern," Kyle Dep., R. 30-21, PageID#1984, into, in Martin's independent evaluation, an "integrity issue[]" meriting "termination," Martin Dep., R. 30-12, PageID#1391.

As a final matter, it is difficult to accept the majority opinion's suggestion that State Farm needed to disprove Gray's allegation of retaliation before it could proceed to discipline her. *See* Maj. Op. 18. The unworkability of such a rule should give us pause from the outset: Can employees across our circuit now temporarily immunize themselves from workplace discipline merely by spitting out a claim of retaliation upon being informed of the allegations against them? Given this far-fetched result, it is no surprise that this rule finds no support in the cited passage from Justice Alito's *Staub* concurrence.

True, the concurring opinion called for "an independent investigation of *the matter*" when a decisionmaker "is put on notice that adverse information may be based on [illegal] animus." *Staub*, 562 U.S. at 425 (Alito, J., concurring in the judgment) (emphasis added). But context makes clear that the referenced "matter" to be investigated is not the alleged retaliation itself, but rather the "accuracy of th[e] information" the supervisor provided. *Id.* By the time Gray "alerted" State Farm "to the possibility that [the] adverse information" implicating her "may be tainted," State Farm had already conducted its "reasonable investigation," one that not only confirmed "the accuracy of that information," but also found separate evidence supporting Gray's termination. *Id.* In short, under any duty to investigate to be gleaned from Justice Alito's opinion, State Farm did not "delegate[] . . . decisionmaking power to" Kyle. *Id.*

\*     \*     \*     \*     \*

For jurists, it can sometimes be tempting to offer "solutions that the parties do not seek." *Zakora v. Chrisman*, 44 F.4th 452, 486 (6th Cir. 2022) (Sutton, C.J., concurring in part and dissenting in part). But at day's end, each of us must remain vigilant in honoring our modest role as "neutral arbiter of matters the parties present." *Sineneng-Smith*, 140 S. Ct. at 1579. As has long been the case, it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Guarino*, 980 F.2d at 406. Today's case amply demonstrates how casting aside these party presentation principles to instead frame a party's case in whatever way we see fit yields a wave of unending problems.

For starters, if one were in the business of crafting arguments the parties never made, that leaves available other unbriefed grounds on which we might also decide the case. Take, for example, the other aspects of cat's paw liability described by the Supreme Court in *Staub*. In applying "traditional agency principles" to base this theory on the actions of "a supervisor," *Staub* signaled that the agency-based framework from *Burlington*, 524 U.S. at 758, applies here too. *Staub*, 562 U.S. at 422 n.4 (citing *Burlington* and "express[ing] no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision"). With that in mind, I doubt whether Kyle— who was not Gray's manager and seems to have lacked any "hiring" or "firing" power over her—was Gray's "supervisor." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). *Staub* likewise calls on "general tort law" to demand proof of Kyle's "specific intent to cause" Gray's termination. *Staub*, 562 U.S. at 419, 423. On this point too, I see no "significant probative evidence," *Walden*, 119 F.4th at 1057, that Kyle either "desire[d] to cause" Gray's termination or "believe[d]" it "substantially certain to result from" his actions, *Staub*, 462 U.S. at 422 n.3 (citation omitted). (The majority opinion, it also bears adding, confusingly collapses this "intent prong," which focuses on the desired result, with the separate requirement of a retaliatory "motive[]," which hinges on the reasons for desiring that result. Maj. Op. 15. The Supreme Court clearly framed "motivat[ion]" and "inten[t]" as distinct requirements in a cat's paw claim. *Staub*, 562 U.S. at 422.)

And then reflect on the ramifications on the litigation's other participants. How disappointed State Farm must be to find out it lost a case it was never asked to defend. Judge Marbley too, who has now been reversed for errors he never had the chance to commit. While there are no true winners in these extra-judicial circumstances, Gray, on the other hand, must feel like she reaped a windfall. After all, she seemingly found more capable advocates on the appellate bench than she did at counsel table. Better to be lucky, it turns out, than good.

As the case was presented to us by the parties, State Farm was entitled to summary judgment. On that basis, I would affirm the district court.